536 S.E.2d 408

**Kimberly Johnson WELCH, as Personal Representative of the Estate of Marshall O. Welch, Jr., Respondent/Appellant,**

**v.**

**Franklin M. EPSTEIN, M.D.; Martin Greenberg, M.D.; and Southern Neurologic Institute, P.C., Defendants,**

**of whom Franklin M. Epstein, M.D. and Southern Neurologic Institute, P.C. are Appellants/Respondents.**

**No. 3235.**

Court of Appeals of South Carolina.

Heard June 5, 2000.

Decided July 31, 2000.

Rehearing Denied Nov. 4, 2000.

---

4. Because we affirm the trial court on this ground, we need not reach Farm Bureau's other issues.

Stephen P. Groves, Sr., John Hamilton Smith and Stephen L. Brown, all of Young, Clement, Rivers & Tisdale, of Charleston; and David A. Brown, of Aiken, for Appellants/Respondents.

Doyet A. Early, III, Richard B. Ness and Norma A.T. Jett, all of Early & Ness, of Bamberg, for Respondent/Appellant.

Amicus Curiae: O. Fayrell Furr, Jr., of Furr & Henshaw; and Glenn V. Ohanesian, of Ohanesian & Ohanesian, both of Myrtle Beach, on behalf of the South Carolina Trial Lawyers Association.

ANDERSON, Judge:

This is a medical malpractice case arising out of the death of Marshall O. Welch, Jr. The jury awarded actual damages of $28,535.88 in the survival suit, $3,000,000 in the wrongful death claim, and punitive damages of $3,900,000. After the verdict, the judge issued an order entering a partial set-off against the verdicts based upon a settlement with a prior defendant. Cross appeals have been filed. Dr. Franklin Epstein and Southern Neurologic Institute (hereafter, collectively referred to as Dr. Epstein) raise issues concerning (1) the denial of their motions for directed verdict and judgment notwithstanding the verdict (JNOV); (2) the denial of their new trial motion based upon the excessiveness of the actual and punitive damages verdicts; and (3) the jury charge on

punitive damages.[1] The personal representative, Kimberly Johnson Welch, challenges the set-off order. We affirm.

## FACTS/PROCEDURAL BACKGROUND

Marshall O. Welch, Jr. (Welch) was a thirty-seven year old registered nurse employed by Southern Neurologic Institute. He worked for Dr. Franklin Epstein, a board certified neurosurgeon, who practiced at Southern Neurologic Institute along with Dr. Martin Greenberg. Welch assisted Dr. Epstein for almost three years in the care of surgical patients.

Welch suffered from severe back pain, which began between 1990 and 1992. Dr. Epstein characterized it as an "unrelenting backache." According to Dr. Epstein, Welch initially went to Dr. Greenberg about the problem because "being a stoic, [he] didn't want to let on to me directly that he was needing something."

In June or July of 1995, Welch was taking a significant amount of prescribed pain medication, including Tylox and Vicodin. Welch might also have been using sample pain medication from the drug cabinet at Southern Neurologic Institute. Even with this medication, the pain was very severe. Dr. Greenberg stated he did not know how Welch continued to work. During the latter part of 1995, Welch's pain worsened. Dr. Greenberg recommended surgery. Welch consulted Dr. Melvyn Haas, a neurologist, for a second opinion in February of 1996. Dr. Haas agreed surgery was indicated.

The surgery involved a neurological and an orthopedic component. The orthopedic procedure would result in blood loss. Dr. Epstein declared Welch was adamant he did not want a transfusion unless there was no alternative. As a result, a cell saver was used during the surgery to "save [Welch] from getting donor blood by using [his] own blood." A cell saver is a machine which processes blood lost from a

---

1. The "Statement of the Issues on Appeal" by Dr. Epstein includes an issue concerning the format of the special interrogatories submitted to the jury, but the issue is not specifically argued in the body of the brief. Thus, the issue is deemed abandoned. *Taylor v. Medenica*, 331 S.C. 575, 503 S.E.2d 458 (1998)(issue which is raised but not argued in brief is deemed abandoned and will not be considered on appeal).

patient during surgery. The plasma and platelets are washed out and the packed red cells are returned for use in the patient.

On the morning of Thursday, February 22, 1996, Welch was admitted to the Aiken Regional Medical Center. At admission, his blood pressure was 126 over 72; temperature was 97.4; pulse was 71; and respiration was 18. His pre-operative hemoglobin was 14.4 and hematocrit was 42. Hemoglobin is a pigment within a red blood cell that carries the oxygen molecule. Hematocrit refers to the percentage of total blood volume that consists of red blood cells. Welch's estimated blood volume was 5,852 cc's.

Dr. Epstein was the attending neurosurgeon assisted by Dr. Greenberg. There is no issue concerning Dr. Epstein's performance of the neurosurgery. Henry Holsenback, a registered nurse anesthetist, administered the anesthesia to Welch and monitored his vital signs. Welch received approximately 2,500 cc's of fluid and 625 cc's of blood cells from the cell saver. Holsenback estimated that during the surgery Welch had a blood loss of 2,000 cc's, which is normal for this type of fusion back surgery. Mary Ann Camp, the operator of the cell saver, noted a net blood loss of 2,000 cc's during surgery and another 100 cc's of blood lost from the time Welch left the operating room until Camp hooked up the hemovac in the recovery room. A hemovac is a machine which pumps blood and other liquids from a wound or surgical site.

During the surgery, Holsenback applied a 50 micrograms per hour Fentanyl transdermal patch to Welch as ordered by Dr. Epstein for post-op pain control. Fentanyl, a narcotic analgesic, is a very strong pain reliever. It is fifty to one hundred times as potent as morphine. A transdermal patch is designed to mimic an infusion or to drip medication into the patient's body so as to deliver the medication over a long period of time. Although not charted, Holsenback asserted the patch came off and was missing when the sterile drapes were removed from Welch.

Laurel Phillips, a recovery room nurse, charted a total "red drainage" into the hemovac of 300 cc's. Welch's heart rate elevated from 80 to 115 beats per minute. Phillips contacted the anesthesiologist, who ordered a complete blood count

(CBC) and 500 cc's of Hespan, a volume expander. The lab report indicated a hemoglobin of 12 and a hematocrit of 33.2. Welch complained of pain and received 2.5 milligrams of Dilaudid, 25 milligrams of Phenergan, and 1 milligram of Valium. Dilaudid is a narcotic analgesic. Phenergan prevents nausea and is a mild anti-anxiety agent. Valium is an anti-anxiety agent. Another 50 microgram Fentanyl patch was applied pursuant to Dr. Epstein's orders to replace the patch which had fallen off. Welch was discharged to the floor. At that time, his pulse rate was 120 and respirations were 16.

The following day, Friday, February 23, drainage from the hemovac was measured at 385 cc's. Welch's hemoglobin level on Friday morning was 8.6. His hematocrit was 24.6. When Dr. Epstein saw Welch on Friday, Welch was puffy and pasty looking, which is not unusual for someone who has just had major surgery. He was aware of the hemoglobin level, but expected the drop due to dilution from fluids received during surgery and in the recovery room. Dr. Epstein claimed Welch was fluid overloaded, not fluid depleted. Dr. Epstein knew Welch was receiving a lot of pain medication. During that day, Welch received six injections of Dilaudid, four injections of Phenergan, and a dosage of Valium by mouth. Further, he was receiving 50 micrograms of Fentanyl hourly from the patch. Dr. Epstein computed the combined pain medication on Friday equaled ten milligrams of morphine per hour. Yet, Dr. Epstein did not feel Welch was seriously volume depleted or over medicated. In addition, he did not believe the hemoglobin decrease was causing a problem as Welch was not short of breath, had no chest pain, good mental status, and good urine output.

On Saturday, February 24, Darlene Colvin was the charge nurse on Welch's floor during the 7:00 a.m. to 7:00 p.m. shift. Approximately 100 cc's of drainage was charted before the hemovac was removed at 7:44 a.m. Colvin noted a morning hemoglobin level of 6.9, which was rechecked and reported as 6.6. Dr. Epstein called in that morning and Colvin advised him of the hemoglobin level. According to Dr. Epstein, the hemoglobin level was getting close to the 6.0 trigger point for transfusion, but he was aware of Welch's desire not to have transfusions. Since Welch had a normal blood pressure, was

alert, and urinating, Dr. Epstein decided to wait and re-check the hemoglobin later.

Dr. Melvyn Haas was taking calls for Dr. Epstein on Saturday. Dr. Haas found Welch alert and oriented, but with a temperature. Dr. Haas noted the hemoglobin level was "strikingly low" in comparison to the pre-op level. He talked to Welch about the possible need for a transfusion. Welch indicated he did not want one because of the risks. Based upon the presence of a fever and his conversation with Welch, Dr. Haas ordered a CBC and an "H and H," a hemoglobin and hematocrit check. Dr. Haas felt he had an agreement from Welch that if the hemoglobin level went any lower, Welch would receive a couple of units of packed red blood cells.

In the afternoon, Dr. Greenberg saw Welch while he was on the floor checking another patient. Dr. Greenberg ordered Valium for Welch's back spasms. Around 4:20 p.m., Dr. Haas called to check on Welch's lab results. The hemoglobin level was 6.5 and Welch still had a fever. Dr. Haas ordered two blood cultures and a transfusion of two units of packed blood cells. In her nurse's progress notes, Colvin wrote that Dr. Greenberg called the hospital at approximately 4:45 p.m. in response to Welch "beep[ing] him." Dr. Greenberg was notified of Welch's increasing temperature, his hemoglobin level of 6.5, and Dr. Haas' transfusion order. According to Colvin's notes, Dr. Greenberg agreed Welch needed a transfusion. Dr. Greenberg denied making that statement.

At 5:30 p.m., Darlene Colvin called Dr. Epstein at home because Welch had asked her to contact him regarding Dr. Haas' transfusion order. Colvin's progress note reads:

Dr. Epstein not on call this weekend, but I attempted to reach him. I phone[d] his home and notified Dr. Epstein of [Welch's] condition. Notified that Dr. Haas had given orders to transfuse [two] units of packed cells for [hemoglobin] of 6.5. Also notified that [Welch] had develop[ed] puffiness to the [left] side of incision that was soft. Informed of [Welch's] increasing temp[erature] with [no] response to Tylenol. Notified Dr. Epstein that [Welch] was very rigid and [complaining of] discomfort to the groin area. Dr. Epstein gave order to not transfuse [Welch] and to stop drawing labs.

The physician's order form indicates a phone order at 5:30 p.m. from Dr. Epstein per Darlene Colvin as follows:

(1) Cancel transfusion; (2) Cancel all labs; (3) Increase Fentanyl patch to 100 micrograms; (4) Valium, 5 milligrams, PO every eight hours; (5) Compazine, 10 milligrams, PO every six to eight hours as needed; (6) Colace, 100 milligrams, PO, BID.

Dr. Epstein recalled the telephone conversation with Darlene Colvin. He believed the slight drop in the hemoglobin level was within an accepted error margin. Dr. Epstein decided to "hold off on" the transfusion because Welch was thinking clearly, urinating, and had a stable blood pressure. He instructed Colvin to increase the dosage of the Fentanyl by adding a second patch because of the regularity with which Welch was asking for additional pain medication. Dr. Epstein did not do a blood culture for the fever because he was unconcerned with the presence of a fever a few days after surgery. The additional Fentanyl patch was not immediately applied by the nursing staff because Welch received injections of Dilaudid and Phenergan at 5:40 p.m. and was resting comfortably. As charge nurse, Darlene Colvin agreed with this nursing decision by Welch's primary care nurse.

About 6:25 p.m., Dr. Haas called to check on the transfusion and lab results. Darlene Colvin advised him that Dr. Epstein had canceled the orders. Dr. Haas then ordered a hemoglobin check and CBC to be performed at 8:00 p.m. He asked to be notified if the hemoglobin level decreased below 6.5.

During her Saturday shift, Colvin did not observe any indication of hypoventilation in Welch, but he was tachycardic. Hypoventilation refers to depressed respiration, a slower than normal breathing rate. Tachycardia, an abnormally rapid heartbeat, is a sign of blood loss. Between 2:20 a.m. and 8:30 p.m. on Saturday, Welch received five injections of Dilaudid, three injections of Phenergan, and two doses of Valium by mouth. This was in addition to the Fentanyl patch of 100 micrograms, which was given at 10:15 p.m.

Sherryl Brooks Scott was the charge nurse for Welch's floor on the 7:00 p.m. to 7:00 a.m. shift on Saturday night. Scott was working with Deborah Cole, a senior L.P.N. and the primary care nurse for Welch. Around 8:30 p.m., Welch was

given additional Dilaudid and Phenergan and was resting comfortably. Because of this, during the early evening hours, Scott and Cole made a nursing decision not to apply the Fentanyl patch which Dr. Epstein had ordered at 5:30 p.m.

About 8:00 p.m., blood was drawn for the lab work ordered by Dr. Haas. A report of a hemoglobin level of 6.0 was received around 10:00 p.m. About that time, Dr. Haas called to check on the lab results as he had not yet been notified. Upon being advised of the result, Dr. Haas told the nurse to call Dr. Epstein and see what he wanted to do. Dr. Haas felt a transfusion was required.

Scott "beeped" Dr. Epstein. When Dr. Epstein called in, he spoke with Scott and Cole. Scott's progress note provides:

> Dr. Epstein answered his page and was informed of [patient's hemoglobin] being 6.0 and was informed that Fentanyl patch was held at this time due to [patient] being comfortable and sleeping but easily aroused. Dr. Epstein ordered for 3 units of PRBC's [packed red blood cells] to be given and to put Fentanyl patch on now and to do a finger stick H and H after transfusion.

In her conversation with Dr. Epstein, Cole informed him that she had not applied the Fentanyl patch because Welch had been given Dilaudid and Phenergan at 8:30. Her nursing judgment was to hold off on applying the patch. Dr. Epstein was very critical of her decision. He ordered her to apply the patch immediately. Cole removed the Fentanyl patch that was on Welch and applied two 50 microgram patches. In his recollection of the conversation, Dr. Epstein testified he told the nurse to do what he said and put the patch on. He made the decision to transfuse due to the lower hemoglobin level, the continued tachycardia, and reduced fever.

Scott was unsuccessful in getting the needle into Welch's vein for the transfusion so she requested assistance from an ICU nurse. The ICU nurse, Martha Ulmer, had a difficult time finding a vein in Welch's hands. When the needle was inserted in his right hand, she did not "get much of a blood return." The transfusion needle was removed from the right hand and inserted in the left hand. According to Ulmer, when there is not "much of a blood return" after an IV has been

inserted, that may indicate the patient has a low volume of blood, "like there [isn't] much circulating."

The nurse started the transfusion in the early morning hours of Sunday, February 25th. When the nurse checked on Welch at 2:00 a.m., she found the transfusion in progress with Welch sleeping but easily aroused, alert, and oriented. At 4:00 a.m., a second unit of red blood cells was started. At that time, Welch was alert, oriented and easily aroused from sleep.

At 5:30 a.m., Cole checked on Welch and found him alert. He spoke to her and held the thermometer while she took his temperature. However, at 6:00 a.m., Cole could not rouse Welch so she called Scott to the room. Scott tried to rouse Welch but was unable to do so. She called for an ICU nurse to come to the room. The ICU nurse described Welch's skin as "very, very white" with his mouth and tongue a light white color. That indicated Welch "had a blood circulatory and blood volume problem."

Approximately 6:10 a.m., while the nurses were in the room with him, Welch's pulse and respirations ceased. The ICU nurse stated she lost his pulse and then she "looked down and he was not breathing." Cardiopulmonary resuscitation was immediately initiated and a code was called. Narcan was administered to counter the effect of the narcotics. Resuscitation efforts continued and Welch was transferred to ICU. On Sunday morning, Dr. Epstein entered a note stating Welch had suffered a respiratory arrest secondary to narcotics. Dr. Epstein declared that at the time this note was made he was not aware that Welch's pulse had ceased prior to the time his respirations stopped.

While in the ICU, Welch received six units of blood and other fluids. He was maintained on life support for several days. However, because he had failed to regain consciousness and exhibited no brain activity, he was removed from life support on February 29, 1996. Dr. Epstein's discharge summary noted a final diagnosis of "respiratory arrest." At the time of trial, Dr. Epstein testified his opinion was Welch did not receive an overdose of narcotics. Based upon further review of the record, he was of the opinion Welch died from a massive pulmonary embolism.

*Expert Witnesses Presented by the
Personal Representative*

The personal representative presented three expert witnesses: (1) a clinical pharmacologist; (2) a hematologist; and (3) a neurosurgeon.

A. Clinical Pharmacologist—Dr. Pamela J. Simms

Dr. Pamela Simms testified as an expert witness in the field of clinical pharmacology. Dr. Simms reviewed the product information for the Fentanyl transdermal patch prescribed by Dr. Epstein. A warning label on the package stated "NOT FOR ACUTE OR POSTOPERATIVE USE." The product insert sheet for the Fentanyl patch contained the following contraindication:

BECAUSE SERIOUS OR LIFE–THREATENING HYPOVENTILATION COULD OCCUR, DURAGESIC (FENTANYL TRANSDERMAL SYSTEM) IS CONTRAINDICATED:

● In the management of acute or post-operative pain, including use in out-patient surgeries.

Additionally, the insert sheet included a warning about the concomitant use of other drugs with the Fentanyl:

THE CONCOMITANT USE OF OTHER CENTRAL NERVOUS SYSTEM DEPRESSANTS, INCLUDING OTHER OPIOIDS, SEDATIVES OR HYPNOTICS, GENERAL ANESTHETICS, PHENOTHIAZINES, TRANQUILIZERS, SKELETAL MUSCLE RELAXANTS, SEDATING ANTIHISTAMINES, AND ALCOHOLIC BEVERAGES MAY PRODUCE ADDITIVE DEPRESSANT EFFECTS. HYPOVENTILATION, HYPOTENSION AND PROFOUND SEDATION OR COMA MAY OCCUR. WHEN SUCH COMBINED THERAPY IS CONTEMPLATED, THE DOSE OF ONE OR BOTH AGENTS SHOULD BE REDUCED BY AT LEAST 50%.

Further, the sheet provided a warning regarding the use of the drug in patients with a low blood volume.

Dr. Simms stated the product information contraindicated (1) using the patch in an acute care setting; (2) using starting dosages higher than 25 micrograms per hour; and (3) using

the patch in the management of pain that could be treated with a non-opiate drug. In her opinion, the use of the transdermal patch was not an approved use in Welch's case because it was used for post-operative pain and it was started at the highest, rather than the lowest, dosage. Dr. Simms testified the hospital record indicated Welch received moderate to aggressive dosages of Dilaudid, Phenergan, and Valium. She declared:

> [A]ll of these medications affect the central nervous system; that system we were talking about that helps us stay alert, and that controls our breathing and our heart and things like that. And all of these medications tends to depress it, or cause it to be less able to function. So it causes a person to be more sedate, for them to breathe less efficiently, for their heart to beat less efficiently. And all of these do that together. And one of the rules that people use when they use medications like this that add together the same ... [e]ffect is each time you add another medication that has the same affect, you should decrease the dose of one or both.

Given that the other medications were used in conjunction with the Fentanyl patch, Dr. Simms opined the dosages should have been reduced. According to Dr. Simms, care should have been exercised in the use of the Fentanyl patch and the other drugs if there was a low hemoglobin because the drugs would add to any underlying condition of drowsiness or improper breathing. Moreover, an inadequate hemoglobin slows down the body's ability to rid itself of the drugs.

### B. Hematologist—Dr. Samuel K. Morgan

Dr. Samuel K. Morgan testified as an expert in the field of hematology. In his opinion, Welch suffered a substantial blood loss and Dr. Epstein deviated from the standard of care by (1) not determining the cause of the bleeding; (2) not defining the extent of the bleeding; and (3) not timely treating the situation. It was more likely than not that these deviations were a cause of Welch's death.

The drop in the hemoglobin levels indicated Welch was anemic and the anemia was due to blood loss. Anemia is a condition which involves a low red blood cell count and hemoglobin. The extent of the anemia was not recognized. Based upon a comparison of the starting hemoglobin and hematocrit

levels versus the last recorded levels before his arrest, Welch suffered a blood loss equaling 58% of his total blood volume. Dr. Morgan stated a loss of this percentage of blood volume is not compatible with life. He further testified:

I think that from the time that we began the surgery and when we had the numbers that he came into the hospital with for hemoglobin and hematocrit, namely 41.6 hematocrit and 14.4 hemoglobin, until the time we achieved this last level in the chart, we have a time in which the hemoglobin gradually fell in general figures from the pre-op 14 to recovery room 12 to a value the next morning after surgery at 5:45—that would have been on the 23rd, of 8.6, so we see a gradual fall in the hemoglobin. And then no evaluation of his blood counts until 27 hours later at approximately 8:40 on the following morning.... That would have been the 24th, from 5:45 am on the 23rd until 8:40 on the 24th, 27 hours. At which time, on the 24th, his hemoglobin was 6.5.... I think that this was a critical period of time where no attention was paid to his blood counts, and I said this was critical because if we show that he has lost more than 50 percent of his blood at the time the last blood count was done during this period of time that he must have passed through the time period where he lost at least 30 to 40 percent of his blood. And when we pass through that point, unless further hemorrhage or unless further blood loss is prevented and appropriate treatment undertaken, then significant organ damage occurs and death ensues. Death occurs. That doesn't say when death occurs but it says predictably that death will occur.

## C. Neurosurgeon—Dr. Victoria Samuels

Dr. Victoria Samuels, a board certified neurosurgeon, testified as an expert in the field of neurosurgery. Based upon a review of the medical records and deposition testimony of various witnesses, Dr. Samuels declared Dr. Epstein deviated from the generally accepted standard of care for neurosurgeons in (1) the management of the anemia; (2) the management of the volume depletion; and (3) the use of medications.

In her opinion, given the drop between the pre-operative and post-operative hemoglobin and hematocrit levels, a check of those levels should have been performed on Thursday

evening after the surgery. Moreover, according to Dr. Samuels, once the levels were checked on Friday morning and a hemoglobin level of 8.6 was noted, a transfusion should have been considered. Welch was anemic at that time and had experienced a significant blood loss. It was a deviation from the standard of care to wait until Saturday morning to obtain the next hemoglobin level. Dr. Samuels stated Welch lost 3,245 cc's or 55% of his total blood volume. He was volume depleted. I.V. fluids should have been started in the recovery room and continued. Canceling the transfusion and lab orders on Saturday afternoon was a deviation from the standard of care. Starting the transfusion after midnight on February 25th was "a day late and a dollar short."

The use of the Fentanyl patch was a deviation from the standard of care due to the contraindications in the product literature and Welch's low blood volume. The use of the other pain medications at the levels prescribed in conjunction with the Fentanyl patch was a deviation from the standard of care.

In Dr. Samuels' opinion, the cumulative effect of the drop in hemoglobin level, volume depletion, and use of the Fentanyl patch in conjunction with the other drugs caused Welch's death. When asked the cause of Welch's coma, Dr. Samuels replied: "The cause of the coma was anoxic brain injury which they were able to see on a CT scan, and it is my belie[f] that the anoxic brain injury itself was through a combination of three factors; one being hypo—low volume; the second being . . . anemia and the third being the medication causing the hypoventilation." The following colloquy occurred on redirect examination:

Q: Now, Doctor, let's sort of wrap it up. We've got the situation with the volume depletion; we've got the situation with the hemoglobin which went to 6, and we've got the Fentanyl patch and the concomitant use of the Dilaudid, Phenergan, Valium and Compazine. What cumulative [e]ffect did all three of those things [the medicines, the low volume and the low blood] have on [Welch]?

. . . .

A: Okay. I believe what it did was cause his demise. The combination of the low blood volume, the low volume with the anemia is what they call a lethal combination in general

surgery. And the body's attempt to take care of that is with hyperventilation or breathing fast, upping your blood pressure and your heart rate, okay? And unfortunately, the three things the body—the only three things the body has to do to compensate, to help tackle the low volume and the low blood is those three things, and those three things were markedly depressed because of the massive amount of medicine he was given and the types of medicine he was given.

## *ISSUES*

I. Did the trial court err in failing to grant Dr. Epstein's motion for JNOV as to negligence?

II. Did the trial judge err in denying Dr. Epstein's motions for directed verdict and JNOV as to punitive damages?

III. Did the trial court err in refusing to grant Dr. Epstein's motion for new trial as to actual damages?

IV. Did the trial judge erroneously deny Dr. Epstein's motion for new trial as to punitive damages?

V. Was the jury instruction as to punitive damages incorrect?

VI. Did the trial court err in granting Dr. Epstein's motion for set-off against the wrongful death verdict in an amount greater than $5,000?

## *LAW/ANALYSIS*

### I. APPEAL OF DR. EPSTEIN AND SOUTHERN NEUROLOGIC INSTITUTE

#### A. DIRECTED VERDICT/JUDGMENT NOTWITHSTANDING THE VERDICT (JNOV)

When reviewing the denial of a motion for directed verdict or JNOV, this Court must employ the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Steinke v. South Carolina Dep't of Labor, Licensing and Regulation,* 336 S.C. 373, 520 S.E.2d 142 (1999); *Gasti-*

*neau v. Murphy*, 331 S.C. 565, 503 S.E.2d 712 (1998). The trial court must deny the motions when the evidence yields more than one inference or its inference is in doubt. *Steinke, supra.* This Court will reverse the trial court only when there is no evidence to support the ruling below. *Id.; Creech v. South Carolina Wildlife and Marine Resources Dep't*, 328 S.C. 24, 491 S.E.2d 571 (1997). When considering directed verdict and JNOV motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence. *Creech, supra; Reiland v. Southland Equip. Serv. Inc.*, 330 S.C. 617, 500 S.E.2d 145 (Ct.App.1998).

A motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict. *Crossley v. State Farm Mut. Auto. Ins. Co.*, 307 S.C. 354, 415 S.E.2d 393 (1992). The jury's verdict will not be overturned if any evidence exists that sustains the factual findings implicit in its decision. *Smalls v. South Carolina Dep't of Educ.*, 339 S.C. 208, 528 S.E.2d 682 (Ct.App.2000); *Hunter v. Staples*, 335 S.C. 93, 515 S.E.2d 261 (Ct.App.1999).

### 1. Motion for JNOV as to Negligence

Dr. Epstein argues the trial court erred in failing to grant his motion for JNOV as to negligence. We disagree.

This is a complex medical negligence case. The personal representative presented three expert witnesses who gave their opinions concerning the applicable standard of care and deviations by Dr. Epstein from that standard of care. Dr. Epstein testified in his own defense. In addition, he presented an expert witness, Dr. Joseph Marzouff, a board certified neurosurgeon, who testified there was no deviation from the applicable standard of care.

Clearly, conflicting evidence exists in this case. It is not the function of this Court to weigh the evidence and resolve those conflicts. In a negligence case on appeal from a jury verdict, the jurisdiction of an appellate court extends merely to the correction of errors of law and factual findings of the jury will not be disturbed unless a review of the record discloses there is no evidence which reasonably supports the findings.

Here, more than one reasonable inference could be drawn from the evidence. The evidence supports the factual findings implicit in the jury's verdict. Viewing the evidence in the light most favorable to the personal representative, we find the trial court properly denied Dr. Epstein's motion for JNOV as to negligence.

## 2. Motions for Directed Verdict and JNOV as to Punitive Damages

Dr. Epstein claims the trial court erred in denying his motions for directed verdict and JNOV as to punitive damages because the personal representative "failed to present 'clear and convincing evidence' showing she was entitled to punitive damages." We disagree.

In order to receive an award of punitive damages, the plaintiff has the burden of proving by clear and convincing evidence the defendant's misconduct was willful, wanton, or in reckless disregard of the plaintiff's rights. S.C.Code Ann. § 15–33–135 (Supp.1999); *Taylor v. Medenica*, 324 S.C. 200, 479 S.E.2d 35 (1996). A conscious failure to exercise due care constitutes willfulness. *McCourt by and through McCourt v. Abernathy*, 318 S.C. 301, 457 S.E.2d 603 (1995); *Hawkins v. Pathology Assocs. of Greenville*, 330 S.C. 92, 498 S.E.2d 395 (Ct.App.1998). The issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless, willful, or wanton. *Graham v. Whitaker*, 282 S.C. 393, 321 S.E.2d 40 (1984); *Hawkins, supra.*

There is clear and convincing evidence of Dr. Epstein's reckless culpability justifying an award of punitive damages. Dr. Epstein was aware of the manufacturer's warning concerning the use of the Fentanyl transdermal patch in a post-operative setting. However, he chose to use the patch despite that warning. Dr. Epstein testified on cross examination that he knew more about the drug than "people down here." Dr. Epstein opined his practice was more advanced than others in the area. He stated "[t]his has been a recurrent theme to try to undercut me when I came here because the Augusta physicians and Columbia physicians were practicing like Eisenhower was still in office." There was evidence

no other doctor used the Fentanyl transdermal patch in this manner. While Dr. Epstein's expert witness, Dr. Marzouff, did not use Fentanyl in a post-operative setting, he declared it would be acceptable to use the Fentanyl patch in a hospital on a patient under close observation with frequent vital sign checks, especially if the patient "had been on a lot of narcotics before."

This was sufficient evidence to create a jury issue as to recklessness. *See McGee v. Bruce Hosp. Sys.*, 321 S.C. 340, 468 S.E.2d 633 (1996)(package inserts for catheters introduced to support a punitive damages award by showing doctor's awareness of the conditions which may be caused by improper placement of catheter). Therefore, the trial court did not err in denying Dr. Epstein's motions for directed verdict and JNOV as to punitive damages.

## B. NEW TRIAL

When a party moves for a new trial based on a challenge that the verdict is either excessive or inadequate, the trial judge must distinguish between awards that are merely unduly liberal or conservative and awards that are actuated by passion, caprice or prejudice. *Allstate Ins. Co. v. Durham*, 314 S.C. 529, 431 S.E.2d 557 (1993). The trial court must set aside a verdict only when it is shockingly disproportionate to the injuries suffered and thus indicates that passion, caprice, prejudice, or other considerations not reflected by the evidence affected the amount awarded. *Vinson v. Hartley*, 324 S.C. 389, 477 S.E.2d 715 (Ct.App.1996). In other words, to warrant a new trial absolute, the verdict reached must be so "grossly excessive" as to clearly indicate the influence of an improper motive on the jury. *Rush v. Blanchard*, 310 S.C. 375, 426 S.E.2d 802 (1993).

The decision to grant or deny a new trial absolute based on the excessiveness of a verdict rests in the sound discretion of the trial court and ordinarily will not be disturbed on appeal. *Krepps v. Ausen*, 324 S.C. 597, 479 S.E.2d 290 (Ct.App.1996). An abuse of discretion occurs if the trial court's findings are wholly unsupported by the evidence or the conclusions reached are controlled by an error of law. *Id.* In deciding whether to assess error when a new trial motion is

denied, this Court must consider the testimony and reasonable inferences therefrom in the light most favorable to the non-moving party. *Vinson, supra.*

 The trial court has wide discretionary power to reduce the amount of a verdict which in his or her judgment is excessive. *Rush, supra.* Indeed, when the verdict indicates the jury was unduly liberal in determining damages, the trial court alone has the power to reduce the verdict by the granting of a new trial *nisi remittitur. Allstate, supra.* A motion for new trial *nisi remittitur* asks the trial court in its discretion to reduce the verdict because it is merely excessive, although not motivated by considerations such as passion, caprice or prejudice. *O'Neal v. Bowles,* 314 S.C. 525, 431 S.E.2d 555 (1993). If the amount of the verdict is grossly excessive so as to be the result of passion, caprice, prejudice or some other influence outside the evidence, the trial judge must grant a new trial absolute, not a new trial *nisi remittitur. Id.* However, the jury's determination of damages is entitled to substantial deference. *Rush, supra.* The judge's decision will not be disturbed on appeal unless it clearly appears the exercise of discretion was controlled by a manifest error of law. *Id.* In considering a motion for new trial *nisi,* the trial court must evaluate the adequacy of the verdict in light of the evidence presented. *Waring v. Johnson,* 341 S.C. 248, 533 S.E.2d 906 (Ct.App.2000).

### 1. Motion for New Trial as to Actual Damages

Dr. Epstein challenges the denial of his motion for new trial or, in the alternative, new trial *nisi remittitur,* arguing the size of the actual damages award indicates it resulted from passion, caprice, prejudice, or other considerations on the part of the jury. We find no error.

 Actual damages in a survival action are awarded for the benefit of the decedent's estate. *Scott v. Porter,* 340 S.C. 158, 530 S.E.2d 389 (Ct.App.2000). Appropriate damages in survival actions include those for medical, surgical, and hospital bills, conscious pain, suffering, and mental distress of the deceased. *Id.* Based upon the evidence that Welch lapsed into a coma from which he never recovered, the trial judge charged the jury it could only award damages in the

survival claim for the amount of the medical bills incurred from the point of the arrest to his death. The jury awarded actual damages of $28,535.88, the amount of those medical bills.

In a wrongful death case, the issue of damages is not directed toward the value of the human life that was lost, but rather the damages sustained by the beneficiaries as a result of the death. *Zorn v. Crawford*, 252 S.C. 127, 165 S.E.2d 640 (1969); *Self v. Goodrich*, 300 S.C. 349, 387 S.E.2d 713 (Ct.App.1989). Damages recoverable in a wrongful death action include: (1) pecuniary loss; (2) mental shock and suffering; (3) wounded feelings; (4) grief and sorrow; (5) loss of companionship; and (6) deprivation of the use and comfort of the intestate's society, including the loss of his experience, knowledge, and judgment in managing the affairs of himself and of his beneficiaries. *Smith v. Wells*, 258 S.C. 316, 188 S.E.2d 470 (1972); *Scott, supra*.

Dr. Oliver Wood, a recognized expert in the field of economics and economic forecasts, testified the pecuniary loss resulting from the death of Marshall Welch was $630,690. At the time of his death, Welch was thirty-seven years old and his widow, Kim, was twenty-eight years old. Their two children were eight and six. Welch was an active, loving husband and father. Despite his physical pain, he was a hard worker. According to Dr. Epstein, "if you cut his legs off he would have tried to keep going." In addition to his nursing career, he helped his father on the family farm. He assisted his wife with work around the house including yard work, maintenance, and cleaning. Welch helped with the care of the children. He was involved in their school and sports activities. The family bicycled together. He took his son hunting and fishing. Every Saturday morning, Welch would take the children out to breakfast and spend the morning with them.

The jury awarded actual damages of $3,000,000 in the wrongful death claim. Given the evidence of the pecuniary and non-pecuniary losses, we conclude the trial judge did not abuse his discretion in refusing to grant the new trial motion based upon the size of the actual damages award. *Cf. Knoke v. South Carolina Dep't of Parks, Recreation and Tourism*, 324 S.C. 136, 478 S.E.2d 256 (1996)(wrongful death verdict of

$3,000,000 for death of twelve year old was not an excessive verdict); *Scott v. Porter*, 340 S.C. 158, 530 S.E.2d 389 (Ct.App.2000)(wrongful death verdict of $1,500,000 for death of nineteen month old child was not excessive).

We affirm the trial judge's denial of Dr. Epstein's motions for new trial absolute or, in the alternative, new trial *nisi remittitur* as to the actual damage verdicts in the survival and wrongful death actions.

## 2. Motion for New Trial as to Punitive Damages

### a. *Gamble*[2] Analysis

Dr. Epstein maintains the trial judge erred in denying his motion for new trial or, in the alternative, new trial *nisi remittitur*, asserting the excessive size of the punitive damages award indicates it resulted from passion, caprice, prejudice, or other consideration on the part of the jury. He further complains the trial judge failed to properly apply the *Gamble* factors. We disagree.

The jury awarded punitive damages of $3,900,000. The evidence at trial established that as of August of 1996, Dr. Epstein had a net worth of $2,811,788. His monthly salary was $60,000 with an estimated yearly bonus of $534,000.

The amount of damages, actual or punitive, remains largely within the discretion of the finder of fact, as reviewed by the trial judge. *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991). The trial judge is vested with considerable discretion over the amount of a punitive damages award, and this Court's review is limited to correction of errors of law. *South Carolina Farm Bureau Mut. Ins. Co. v. Love Chevrolet, Inc.*, 324 S.C. 149, 478 S.E.2d 57 (1996); *Lister v. NationsBank of Delaware, N.A.*, 329 S.C. 133, 494 S.E.2d 449 (Ct.App.1997).

The Due Process Clause of the Fourteenth Amendment prohibits states from imposing grossly excessive punishments on tortfeasors. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct.

---

2. *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991).

1032, 113 L.Ed.2d 1 (1991), the Supreme Court determined whether the Due Process Clause rendered a punitive damages award unconstitutional. The Court noted "unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id.* at 18, 111 S.Ct. at 1043, 113 L.Ed.2d at 20. In *Haslip,* the Court upheld the punitive damages award, finding Alabama's post-trial procedures for scrutinizing such awards and its appellate review "makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Id.* at 21, 111 S.Ct. at 1045, 113 L.Ed.2d at 22.

In response to *Haslip,* the South Carolina Supreme Court, in *Gamble, supra,* developed an eight factor post-verdict review which trial courts are required to conduct to determine if a punitive damages award comports with due process. The *Gamble* factors are:

> (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and finally, (8) as noted in *Haslip,* "other factors" deemed appropriate.

*Gamble,* 305 S.C. at 111–12, 406 S.E.2d at 354. Under *Gamble,* the trial court is not required to make findings of fact for each factor to uphold a punitive damage award. *McGee v. Bruce Hosp. Sys.,* 321 S.C. 340, 468 S.E.2d 633 (1996).

The trial judge correctly submitted to the jury the issue regarding Dr. Epstein's recklessness. The trial judge conducted an appropriate post-verdict *Gamble* review, arriving at well-reasoned conclusions amply supported by the record. The court set forth its findings as to each of the relevant factors articulated in *Gamble.* The judge found the challenged treatment by Dr. Epstein took place over several days. Dr. Epstein ignored a specific manufacturer's warning concerning the use of the Fentanyl patch. He canceled the orders of Dr. Haas for the transfusion on Saturday afternoon.

Expert testimony established Dr. Epstein violated the standard of care in the treatment of anemia and blood volume loss. The judge concluded the award was reasonably related to the foreseeable harm, i.e., the death of the patient, and the award was within Dr. Epstein's ability to pay "without effecting economic bankruptcy." Further, the ratio of actual damages to punitive damages is clearly not excessive. We agree with the trial court's determination the punitive damages award was proper.

■ Although we find the damages award proper under *Gamble,* we must analyze the award in light of the United States Supreme Court's decision in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The Court provided the following guideposts for determining the reasonableness of punitive damages awards: (1) the degree of reprehensibility; (2) the ratio of the punitive damages award to the actual harm inflicted on the plaintiff; and (3) the comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. *Id.*

Under the South Carolina Supreme Court's *Gamble* test and the United States Supreme Court's *BMW* "guideposts," we hold the punitive damage award of $3,900,000 was not unreasonable. We find the punitive damage award is neither "grossly excessive" so as to justify a new trial absolute nor "merely excessive" so as to justify a new trial *nisi remittitur.* Thus, the trial court did not err in denying Dr. Epstein's motions for new trial absolute or, in the alternative, new trial *nisi remittitur* as to the punitive damage verdict.

#### b. "Economic Bankruptcy"

Dr. Epstein contends the trial judge erred in denying his motion for new trial or, in the alternative, new trial *nisi remittitur,* asserting the excessive size of the punitive damages award "clearly violates the law by rendering [him] economically bankrupt." We disagree.

■ While the wealth of a defendant is a relevant factor in assessing punitive damages, it is not necessarily controlling. *Hicks v. Herring,* 246 S.C. 429, 144 S.E.2d 151 (1965). The financial worth of a defendant is a fact properly to be consid-

ered by the jury in determining the amount to be awarded as punitive damages, but evidence of net worth is not a prerequisite to a punitive damage award. *Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258 (1958). The defendant's financial ability to pay is always a factor to be considered by the jury in awarding punitive damages. *Charles v. Texas Co.*, 199 S.C. 156, 18 S.E.2d 719 (1942). Yet, evidence of ability to pay is not a *sine qua non* of a punitive damage award. *Id.* There is "no requirement that the defendant be a man of means before the jury is justified in awarding punitive damages." *Norton v. Ewaskio*, 241 S.C. 557, 565, 129 S.E.2d 517, 521 (1963). *See also Clamp v. Clamp*, 293 S.C. 142, 359 S.E.2d 86 (Ct.App.1987)(financial condition of defendant is factor to be considered by jury in awarding punitive damages but there is no requirement the defendant be a man of means before the jury is justified in awarding punitive damages).

Dr. Epstein cites *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir.1991), in support of his "economic bankruptcy" argument. In *Mattison*, the United States Court of Appeals for the Fourth Circuit reviewed South Carolina's post-*Gamble* punitive damages system. The Court articulated:

If the plaintiff demonstrates an entitlement to punitive damages, we direct that the district court's instructions on the amount of punitive damages that may be awarded include instruction on four aspects, which are derived from *Gamble* and *Haslip:*

(1) *Relationship to harm caused:* Any penalty imposed should take into account the reprehensibility of the conduct, the harm caused, the defendant's awareness of the conduct's wrongfulness, the duration of the conduct, and any concealment. Thus any penalty imposed should bear a relationship to the nature and extent of the conduct and the harm caused, including the compensatory damage award made by the jury.

(2) *Other penalties for the conduct:* Any penalty imposed should take into account as a mitigating factor any other penalty that may have been imposed or which may be imposed for the conduct involved, including any criminal or civil penalty or any other punitive damages award arising out of the same conduct.

(3) *Improper profits and plaintiff's costs:* The amount of any penalty may focus on depriving the defendant of profits derived from the improper conduct and on awarding the costs to the plaintiff of prosecuting the claim. (4) *Limitation based on ability to pay: Any penalty must be limited to punishment and thus may not effect* ***economic bankruptcy.*** To this end, the ability of the defendant to pay any punitive award entered should be considered.

*Mattison,* 947 F.2d at 109–10 (emphasis added). In *Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co.,* 809 F.Supp. 400, 402 (D.S.C.1992), the District Court judge discussed *Mattison:* "The *Mattison* decision significantly altered the law of punitive damages in South Carolina."

Initially, we note that *Mattison* and *Defender Industries* are *not* controlling precedent on this Court. Dr. Epstein's reliance upon *Mattison* and *Defender Industries* is misplaced. Neither *Mattison* nor *Defender Industries* holds that "economic bankruptcy" is an absolute bar to an award of punitive damages. Rather, *Mattison* and *Defender Industries* involve jury instructions that are inclusive of "economic bankruptcy" considerations as one factor in a punitive damage award. If *Mattison* and *Defender Industries* can be construed to erect "economic bankruptcy" as a complete defense to punitive damages in South Carolina, we reject this holding.

■■■ We hold the *"economic bankruptcy"* factor is *not* an absolute bar to the imposition of punitive damages in South Carolina under *Gamble, Hicks, Rogers, Charles,* and *Norton.* In a proper case, the jury may be instructed to consider *"economic bankruptcy"* as one factor in awarding punitive damages.

The broad brush attack launched by Dr. Epstein in reference to the punitive damage award can be crystallized to a financial impact analysis on Dr. Epstein as juxtaposed to his actual economic position. The quintessence of the legal argument presented by Dr. Epstein is a contention that a punitive damage award can *not* thrust a party into "economic bankruptcy." The gist and gravamen of Dr. Epstein's assertion is that the law on punitive damages has evolved to the point of erecting an irrevocable financial barrier to the imposition of

punitive damages if harsh financial realities emanate from the award. We reject this position. It is untenable and unsupportable under South Carolina precedent and decisions of the United States Supreme Court.

## C. JURY INSTRUCTION ON PUNITIVE DAMAGES

Dr. Epstein asserts the trial judge's instruction to the jury as to punitive damages was incorrect because the charge implied the jury could award punitive damages in an amount exceeding Dr. Epstein's net worth.

The trial was bifurcated. In the first phase, the jury determined liability and actual damages. Special interrogatories were submitted to the jury. The jury affirmatively answered the question "[d]o you find that the plaintiff has proven by clear and convincing evidence that Dr. Epstein acted recklessly, wilfully, wantonly, or in conscious disregard for the rights of his patient, Marshall O. Welch, Jr. in proximately causing injury to and the death of Mr. Welch?"

Evidence was received from Dr. Oliver Wood concerning Dr. Epstein's financial statements. As of August of 1996, Dr. Epstein had a net worth of $2,811,788. His monthly salary was $60,000 with an estimated yearly bonus of $534,000.

The attorneys presented closing arguments. The trial judge gave a charge on punitive damages. The judge instructed in part:

> If you decide that punitive damages should be awarded, you must then determine the amount of the punitive damage award to be assessed against this defendant. In doing so, ladies and gentlemen, the law requires that you must consider several factors. First, the amount of the damages or punishment imposed by punitive damages should bare [sic] a reasonable relationship to the nature and the extent of the wrongful conduct and the harm caused. In other words, you should take into account the degree of wrongfulness of the defendant's conduct and the extent of actual damages that resulted from the conduct; and there should be a reasonable relationship between the actual damages and the punishment imposed. Secondly, you must consider any other penalties that may be imposed against the defendant for the conduct involved. Third, you must consider whether

or not the defendant's wrongful conduct conferred any profit on him. You may also consider awarding the plaintiff the cost of prosecuting her claim against the defendant. And fourth, you must also consider the defendant's ability to pay the amount of the punitive damages awarded. In making this determination, the defendant's wealth, or lack of it, is a relevant factor and you would therefore award such amount of punitive damages as would punish the defendant **but not effect economic bankruptcy.** (Emphasis added).

Our state supreme court has indicated that the following factors are relevant to an evaluation of an award of punitive damages. First, the defendant's degree of culpability; the degree of his wrongdoing and his responsibility for it. Second, the duration of the wrongful conduct; how long it lasted. Third, the defendant's awareness of wrongdoing or concealment of wrongdoing. Fourth, whether the defendant had engaged in similar wrongdoing in the past. Fifth, the likelihood that the award will deter the defendant, or others, from like conduct. Sixth, whether the harm that actually resulted was reasonably related to the harm that was likely to result from the wrongdoing. In other words, was the harm foreseeable? And seventh, the defendant's ability to pay.

A trial court must charge the current and correct law. *McCourt by and through McCourt v. Abernathy,* 318 S.C. 301, 457 S.E.2d 603 (1995). *See also Brown v. Smalls,* 325 S.C. 547, 481 S.E.2d 444 (Ct.App.1997)(trial judge is required to charge current and correct law applicable to issues presented). When reviewing a jury charge for alleged error, an appellate court must consider the charge as a whole in light of the evidence and issues presented at trial. *Keaton ex rel. Foster v. Greenville Hosp. Sys.,* 334 S.C. 488, 514 S.E.2d 570 (1999). If the charge is reasonably free from error, isolated portions which might be misleading do not constitute reversible error. *Id.*

Included in the jury charge is the statement "but not effect economic bankruptcy." The jury charge on punitive damages improperly stated the law of South Carolina. "Economic bankruptcy" is *not* a categorical prohibition to an award

of punitive damages. Rather, financial net worth and ability to pay are factors for the jury to consider in awarding punitive damages. It is reversible error to charge a jury that an award of punitive damages may *not* exceed the net worth of a defendant nor effect "economic bankruptcy." The trial judge's instruction to the jury was more favorable to Dr. Epstein than he was entitled to. Thus, we find no reversible error.

## II. APPEAL OF THE PERSONAL REPRESENTATIVE

Three days prior to trial, the personal representative settled wrongful death and survival claims against a co-defendant (hereafter referred to as Doe [3]). The settlement totaled $450,-000, of which the parties allocated $5,000 to the wrongful death claim and $445,000 to the survival claim. Dr. Epstein objected to the proposed allocation between the two claims. He filed a post-trial motion seeking a set-off based upon a reallocation of the settlement proceeds. The judge ordered a reallocation of the settlement: (1) survival action—$28,535.88; and (2) wrongful death action—$421,464.12.

The personal representative does not challenge the offset and satisfaction of the survival verdict. However, she argues only $5,000 should be offset against the wrongful death verdict. She avers the trial judge erred because the parties' allocation between the two claims was not fraudulent and was a valid and reasonable apportionment based upon evidence of conscious pain and suffering which could have been presented against Doe.

A nonsettling defendant is entitled to credit for the amount paid by another defendant who settles. *Powers v. Temple,* 250 S.C. 149, 156 S.E.2d 759 (1967). The reason for allowing such a credit is to prevent an injured person from obtaining a second recovery of that part of the amount of damages sustained which has already been paid to him. *Truesdale v. South Carolina Hwy. Dep't,* 264 S.C. 221, 213 S.E.2d 740 (1975). In other words, there can be only one satisfaction for an injury or wrong. *Id.; Hawkins v. Pathology Assocs. of Greenville,* 330 S.C. 92, 498 S.E.2d 395 (Ct.App.

---

**3.** This designation is used by the Court to protect the anonymity of the settling co-defendant pursuant to a confidentiality agreement.

1998). However, the reduction in the judgment must be from a settlement for the same cause of action. *Hawkins, supra.*

■■■■■ The trial court's jurisdiction to set off one judgment against another is equitable in nature and should be exercised when necessary to provide justice between the parties. *Smalls v. South Carolina Dep't of Education,* 339 S.C. 208, 528 S.E.2d 682 (Ct.App.2000); *Hawkins, supra.* A set-off is not necessarily founded upon any statute or fixed rule of court, but grows out of the inherent equitable jurisdiction of the court. *Rookard v. Atlanta & Charlotte Air Line Ry.,* 89 S.C. 371, 71 S.E. 992 (1911). Therefore, such motions are addressed to the discretion of the court—a discretion which should not be arbitrarily or capriciously exercised.

■■■ Dr. Epstein was not a party to the settlement between the personal representative and Doe and is not bound by its terms. Welch fell into a coma at the time of his arrest and did not recover from that condition. While the personal representative claims Welch was in considerable pain prior to the arrest, that pain was directly related to the back surgery. Further, the trial judge charged the jury only medical bills could be recovered in the survival action and the personal representative did not appeal that ruling.

In our view, a set-off is warranted in the case *sub judice.* Considering the facts and equities of this case, we agree with the trial judge the allocation between the survival and wrongful death claims must yield to fairness and justice.

The personal representative relies on *Ward v. Epting,* 290 S.C. 547, 351 S.E.2d 867 (Ct.App.1986). *Ward* is distinguishable. In *Ward,* prior to her arrest, there was some evidence Mrs. Ward was responding to directions while in the recovery room. Thus, a factual issue was presented as to conscious pain and suffering. The trial judge in *Ward* rejected the argument the pain and suffering cause of action was a sham.

Additionally, the personal representative maintains the trial judge's order contravenes S.C.Code Ann. § 15–38–50 (Supp. 1999). This statute is part of the Uniform Contribution Among Tortfeasors Act. Section 15–38–50 provides:

When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more

persons liable in tort for the same injury or the same wrongful death:

> (1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

> (2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

The trial judge's order complies with § 15-38-50 because there is one complete satisfaction for the injury suffered by Welch. *See Ellis v. Oliver,* 335 S.C. 106, 515 S.E.2d 268 (Ct.App.1999)(trial court correctly reduced jury verdict for wrongful death and survival claims against doctor by $140,000, amount of settlement with hospital, even though settlement constituted the only amount of medical bills and no evidence regarding these hospital bills was introduced in trial against doctor). The trial court properly allocated the settlement proceeds.

## *CONCLUSION*

We affirm the trial court's denial of Dr. Epstein's motions for directed verdict and JNOV as to actual and punitive damages. Further, we find the trial court did not abuse its discretion in denying the new trial motion based upon the size of the actual damages award. In addition, the judge did not err in denying Dr. Epstein's motion for new trial based upon the excessiveness of the punitive damages verdict. The trial judge conducted an appropriate post-verdict *Gamble* review. We agree the punitive damage award is proper under *Gamble* and *BMW*. We conclude the jury instruction by the trial court on punitive damages was not in compliance with South Carolina law. In a proper case, the trial court may instruct the jury to consider "*economic bankruptcy*" as one factor in awarding punitive damages. Moreover, we hold the "*economic bankruptcy*" factor is *not* an absolute bar to the imposition of punitive damages. We rule Dr. Epstein is entitled to a set-

off in the sum of $421,464.12 as to the wrongful death verdict. Accordingly, the judgment of the Circuit Court is

**AFFIRMED.**

HEARN, C.J., and HUFF, J., concur.