# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Stephen R. Edwards, Individually and as Personal Representative of the Estate of Steven Redfearn Stewart, Respondent,

v.

Scapa Waycross, Inc., Appellant.

Appellate Case No. 2019-000649

---

Appeal From York County
Jean Hoefer Toal, Acting Circuit Court Judge

---

Opinion No. 5931
Heard April 14, 2022 – Filed August 3, 2022

---

**AFFIRMED**

---

William Peele Early, of Pierce, Sloan, Wilson, Kennedy & Early, LLC, of Charleston; Joseph C. Wilson, IV, of Joseph C Wilson Law Firm LLC, of Folly Beach; S. Christopher Collier, of Lewis Brisbois Bisgaard & Smith LLP, of Atlanta, Georgia; and Robert B. Gilbreath, of Hawkins Parnell & Young LLP, of Dallas, Texas, all for Appellant.

Mona Lisa Wallace, of Wallace & Graham PA, of Salisbury, North Carolina; Kathleen Chewning Barnes, of Barnes Law Firm LLC, of Hampton; Gregory Lynn Hyland, of Gregory L. Hyland Attorney at Law LLC, of Summerville; Thomas H. Hart, III, of Hart Law LLC, of Summerville; Frederick John Jekel, of Leventis &

Ransom, of Columbia; and William M. Graham, of Wallace & Graham PA, of Salisbury, North Carolina, all for Respondent.

---

**WILLIAMS, C.J.:**  In this mesothelioma case, Scapa Waycross, Inc. (Scapa) appeals the trial court's (1) denial of its motion for judgment notwithstanding the verdict (JNOV); (2) granting a new trial *nisi* additur for Stephen Redfern Stewart's estate, represented by his son Stephen R. Edwards, regarding survival damages; (3) denial to reallocate Stewart's pretrial settlement proceeds; and (4) refusal to admit certain bankruptcy claim forms Stewart filed against other manufacturers of asbestos-containing products.  Principally, Scapa contends Stewart failed to provide legally sufficient evidence to prove Stewart's workplace exposure to its products was a substantial factor that caused his mesothelioma.  We affirm.

## FACTS/PROCEDURAL HISTORY

Stewart was employed by Bowater Southern Paper Corporation from 1963 to 2002 in Catawba, South Carolina.  During his employment, Stewart worked on only paper machine #1, a machine spanning roughly 150 yards that transformed wood pulp into paper.  The machine was composed of four large dryer sections, or drums, and each section had a top and bottom dryer felt.  Dryer felts were large, weighing well over one thousand pounds and measuring over 150 feet long and twenty feet wide.  The wood pulp sat between the two dryer felts as the felts passed the pulp continuously over each dryer section; the felts kept the pulp against the dryer sections and absorbed moisture.  A number of the dryer felts used by Bowater on machine #1 were supplied by Scapa.  Of the seventy-two dryer felts Scapa sold Bowater between 1963 and 1981, twenty-three contained asbestos. Asbestos constituted between 30 and 70% of a dryer felt's total composition in that time period.  An expert who tested two Scapa asbestos-containing dryer felts that Bowater used on machine #1 during Stewart's employment stated that one contained roughly 1,000 pounds of asbestos and the other contained roughly 752 pounds.

While at Bowater, Stewart's job responsibilities routinely involved installing, cleaning, removing, and disposing of dryer felts and cleaning the entire machine. Although Stewart and his coworkers were unable to identify which dryer felts contained asbestos using the naked eye, they all testified to the amount of dust the dryer felts released into the air during the installation, removal, and disposal process, and breathing in the dust.  One coworker testified that after installing a

dryer felt, the employees would have to use an air hose to blow themselves off due to the amount of "lint" the dryer felt left on their clothes. They also discussed the felt removal process in which they used Stanley knives to cut the felts into smaller pieces, freeing the felts from the machine and allowing them to drop into the basement. This process also caused the felts to visibly release dust into the air. Dryer felts would also malfunction and tear off of the machine during the manufacturing process causing doors on the machine to open and release paper particles and dust into the air.

Stewart and his coworkers also testified about keeping machine #1 and its building clean—a process that required freeing large amounts of dust and paper particles from the machine and cleaning up the dust. To perform this task, the men would use high-pressure, compressed air hoses to release old dust from the machine. They also used the hoses to blow the dryer felts to release old, caked paper and dust from the felts. This process produced large amounts of dust, or felt hairs, into the air. One coworker testified that during a downtime for the machine, when the men cleaned it or replaced old dryer felts, the floor could be covered with as much as six inches of dust and old paper particles. That coworker also testified that he had seen Stewart covered from head to toe with felt dust and paper after cleaning machine #1 during a down time.

Stewart retired from Bowater in 2002, and in September of 2012 he was diagnosed with malignant pleural mesothelioma, an aggressive form of lung cancer caused by asbestos exposure and inhalation. In February 2013, Stewart initiated this lawsuit against several entities whose business involved producing, using, or selling asbestos containing products. He asserted claims for strict liability, negligence, and breach of the implied warranty of merchantability. In May 2013, Stewart filed an amended complaint that added Scapa to the lawsuit.

On August 23, 2013, at the age of sixty-nine, Stewart died from mesothelioma, and Edwards, individually and as personal representative of Stewart's estate, filed a motion to substitute party and a motion to file a second amended complaint. Edwards[1] filed the second amended complaint in November 2013, substituting Stewart's personal representative as the plaintiff and adding claims for wrongful death and survival. Prior to trial, Stewart settled with all defendants except for Scapa, which proceeded to trial. The jury returned a verdict for Stewart on the negligence claim and awarded $600,000 in damages for the survival action and $100,000 in damages for the wrongful death action.

---

[1] Hereinafter referred to as Stewart.

Following the verdict, Scapa filed motions for setoff, for production of Stewart's settlements and payments with all third-party tortfeasors, and for JNOV. Stewart did not oppose the motion for setoff, but he filed a motion for new trial *nisi* additur, asking the trial court to increase the verdict to $2.3 million for the survival claim and $600,000 for the wrongful death claim. After a hearing in which the trial court indicated its intent to grant the motion for additur, Scapa filed a motion to reallocate Stewart's settlement proceeds. Stewart had received $1.036 million in prior settlements and he had uniformly allocated 80% of the proceeds towards the wrongful death claim and the remainder to the survival claim.

The trial court issued an order addressing each post trial motion. The trial court granted Stewart's motion for new trial *nisi* additur and increased the survival damages award from $600,000 to $1 million and did not adjust the wrongful death award. The court denied Scapa's motion for JNOV and its motion for production of Stewart's settlements and payments with all third-party tortfeasors. The court granted Scapa's motion for setoff and reduced the $1 million survival damages by $207,200 (20% of Stewart's prior settlement allocation) and the wrongful death award by $828,000 (80% of settlement allocation), which exceeded the jury's award for wrongful death. After applying the setoff rules, the trial court entered judgment against Scapa in the amount of $792,800, the amount remaining for Stewart's survival action. The court also refused to adjust Stewart's internal allocation of settlement proceeds. This appeal followed.

**ISSUES ON APPEAL**

I. Did the trial court err in refusing to grant Scapa's motion for JNOV?

II. Did the trial court err in granting Stewart's motion for new trial *nisi* additur?

III. Did the trial court err in refusing to reallocate Stewart's apportionment of settlement proceeds?

IV. Did the trial court err in refusing to admit claims Stewart submitted against bankrupt manufacturers of asbestos-containing products that Bowater used during Stewart's employment?

**LAW/ANALYSIS**

**I.    JNOV**

Scapa asserts the trial court abused its discretion in failing to grant its motion for JNOV because Stewart failed to prove specific causation between his workplace exposure to their dryer felts and his mesothelioma. Specifically, Scapa contends Stewart failed to meet the specific causation standard set forth in *Henderson v. Allied Signal, Inc.*[2] through scientifically reliable and relevant evidence because his experts (1) used the "cumulative dose" theory in formulating their opinions and (2) did not provide a specific amount of asbestos Stewart was exposed to from its dryer felts or the threshold exposure to asbestos above which he had an increased risk of developing mesothelioma. We disagree and affirm on this issue.

"A motion for a JNOV is 'merely a renewal of [a] directed verdict motion.'" *Jolly v. Gen. Elec. Co.*, 435 S.C. 607, 623, 869 S.E.2d 819, 827 (Ct. App. 2021) (alteration in original) (quoting *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 331, 732 S.E.2d 166, 171 (2012)), *petition for cert. filed* April 11, 2022. Appellate courts must follow the same standard as trial courts when ruling on a JNOV motion: courts must view the evidence and all inferences reasonably drawn from the evidence in a light most favorable to the nonmoving party. *Id.* at 623, 869 S.E.2d at 827–28. "If more than one reasonable inference can be drawn or if the inferences to be drawn from the evidence are in doubt, the case should be submitted to the jury." *Id.* at 623, 869 S.E.2d at 828 (quoting *Williams Carpet Contractors, Inc. v. Skelly*, 400 S.C. 320, 325, 734 S.E.2d 177, 180 (Ct. App. 2012)).

In evaluating a motion for JNOV, trial courts are concerned with the existence of evidence, not its weight, and neither appellate nor trial courts have authority to resolve credibility issues or conflicts in the testimony or evidence. *Id.* Finally, a jury's verdict "must be upheld unless no evidence reasonably supports the jury's findings[,]" i.e., a trial court should only grant a motion for JNOV if no reasonable jury could have reached the verdict. *Id.* (quoting *Curcio v. Caterpillar, Inc.*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003)).

### A. Causation

In products liability cases, a plaintiff seeking recovery under a theory of negligence must prove the proximate cause of his injury was the defendant's defective product. *Id.* at 624, 869 S.E.2d at 828. In South Carolina, plaintiffs must prove both causation in fact and legal causation, established through the foreseeability of the

---

[2] 373 S.C. 179, 644 S.E.2d 724 (2007).

injury, to sufficiently prove proximate causation.  *Bray v. Marathon Corp.*, 356 S.C. 111, 116–17, 588 S.E.2d 93, 95 (2003).  Proximate cause is a question of fact typically reserved for the jury; a trial court's sole inquiry regarding proximate cause is to determine whether only one reasonable interpretation of the evidence exists, and therefore, only one reasonable conclusion can be reached.  *Jolly*, 435 S.C. at 624, 869 S.E.2d at 828.

Further, in toxic tort cases, medical causation requires a plaintiff prove (1) general causation, (2) specific causation, and (3) if there are multiple sources of exposure to a toxin, that the plaintiff's exposure to the defendant's product was a "substantial factor" in his development of a disease.  *Id.* at 624–25, 869 S.E.2d at 828–29.  "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury."  *Id.* at 625, 869 S.E.2d at 828 (quoting *Fisher v. Pelstring*, 817 F. Supp. 2d 791, 814 (D.S.C. 2011)).  "General causation 'is generally not an issue in asbestos litigation' due to the parties' acknowledgment that exposure to asbestos causes mesothelioma."  *Id.* at 625, 869 S.E.2d at 829 (quoting Recent Case, *Tort Law — Expert Testimony in Asbestos Litigation — District of South Carolina Holds the Every Exposure Theory Insufficient to Demonstrate Specific Causation Even If Legal Conclusions Are Scientifically Sound. —* Haskins v. 3M Co., *Nos. 2:15-cv-02086, 3:15-cv-02123, 2017 WL 3118017 (D.S.C. July 21, 2017)*, 131 HARV. L. REV. 658, 658 n.4 (2017)).  Specific causation requires the plaintiff "do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk."  *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997)).  He must prove similarities between himself and the individuals in the studies, which includes proof that (1) he was exposed to the same toxin, (2) the exposure or dose level was comparable to those in the study, (3) the exposure to the toxin occurred before the onset of the injury, and (4) the latency period of the injury is consistent with the individuals in the study.  *Id.*

Moreover, a plaintiff proves a specific product is a substantial factor in the development of his disease when the evidence shows the plaintiff was "expos[ed] to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked."  *Id.* at 626, 869 S.E.2d at 829 (quoting *Henderson*, 373 S.C. at 185, 644 S.E.2d at 727); *see also Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir. 1986) (explaining exposure to a toxic product is actionable when the exposure is frequent, regular, and proximate).  The substantial factor test requires the plaintiff to prove "more than a casual or minimum contact with the product" and introduce evidence that

would allow the jury to conclude that the plaintiff's exposure to the defendant's toxic product was a substantial factor in bringing about the injury. *Lohrmann*, 782 F.2d at 1162.

We find Stewart presented sufficient evidence to prove general causation. *See Jolly*, 435 S.C. at 625, 869 S.E.2d at 828 ("General causation is whether a substance is capable of causing a particular injury or condition in the general population."). Dr. Arnold Brody, Stewart's expert pathologist whose career focused on lung cell biology, explained that chrysotile asbestos fibers, the asbestos Scapa used to manufacture its dryer felts, are capable of reaching a human's lungs after a breath of air. He noted that chrysotile asbestos, like all other forms, is toxic and can cause mesothelioma once it reaches the pleural mesothelial cells surrounding the lungs. He also stated that individuals who are exposed to asbestos at levels above background (the amount in the air) for extended periods of time have an increased risk of developing mesothelioma.

Dr. David Harpole, Stewart's cardiothoracic surgeon who specialized in chest cancers, testified that asbestos exposure, over time, has been the number one cause of mesothelioma. He explained that exposure to asbestos fibers causes the mesothelial cells to lose their ability to quit regenerating new cells, causing the pleura to expand and produce significant amounts of fluid in the lungs. As the excess fluid builds up, it crowds the lungs making it difficult to breath and drowns the lungs with fluid. Dr. Harpole also stated, "[T]he longer and the more exposure [an individual has to asbestos] the more likely [he is] to have asbestos related lung diseases with mesothelioma being one of them."

Finally, Dr. Arthur Frank, a physician specializing in occupational medicine, testified via deposition that all types of asbestos, including chrysotile, and all types of exposures are toxic. He further explained that in North America, while it is a rare disease, mesothelioma is almost exclusively related to asbestos exposure. Dr. Frank also stated it is generally accepted in the scientific, medical, and industrial community that there is no known safe level of asbestos exposure. In explaining an individual's "dose response" to asbestos, a medical concept that spans to practically every known disease, he explained that as an individual's dose increases through exposure, the likelihood of a biological response, whether it be asbestosis or mesothelioma, also increases.

Based on the testimony of these three experts, we find Stewart presented sufficient evidence for a jury to find asbestos exposure can cause mesothelioma. *See id.* at 624, 869 S.E.2d at 828 ("In considering a JNOV, the trial court is concerned with

the existence of evidence, not its weight." (quoting *Curcio*, 355 S.C. at 320, 585 S.E.2d at 274)); *see id* at 625, 869 S.E.2d at 828–29 (stating it is generally settled that asbestos causes mesothelioma in humans).

We also find Stewart provided sufficient evidence for the jury to determine Scapa's dryer felts were a specific cause and substantial factor in Stewart's development of mesothelioma. It was undisputed at trial that Scapa produced dryer felts that contained large quantities of asbestos, that twenty-three of those asbestos-containing dryer felts were used on paper machine #1 during Stewart's employment at Bowater, and that Scapa sold asbestos-containing felts to Bowater that were used on paper machine #1 from 1963 to 1981. Stewart and his coworkers testified regarding their job responsibilities, the extent their jobs required them to interact with dryer felts, and how they breathed in dryer felt dust. Stewart stated during his deposition that while he worked as a utility man, his main job responsibility was cleaning the machine and the building around the machine. He explained this involved cleaning a significant amount of dust and other materials off of the machine that were produced during the paper-making process. Other job responsibilities required him to handle the felts on a regular basis. This included installing, maintaining, and removing the old felts. One coworker stated that he remembered seeing Stewart covered from head to toe in dust and paper particles once after cleaning a dryer felt. Another coworker stated that employees had to use air hoses to blow the felt dust off of each other after the installation process. While removing old felts, which involved cutting through the thick, fibrous material with a Stanley knife, Stewart and his coworkers explained that the felts would release visible dust into the air. Stewart also explained that cleaning dryer felts with high pressure air hoses caused dust from the felts to become airborne. Another coworker stated that after cleaning paper machine #1 during a down time the floor could have as much as six inches of dust on it. All but one position Stewart held while at Bowater required him to participate in cleaning the felts or manually handling the felts.

Dr. James Millette, an expert in material sciences who specialized in asbestos, testified regarding two Scapa dryer felts that were used on paper machine #1. Dr. Millette stated one felt contained over 1,000 pounds of asbestos fibers (roughly 99 quadrillion fibers) and the other contained over 700 pounds of fibers (roughly 69 quadrillion fibers). He found that after testing the two felts, they both released breathable asbestos fibers into the air after being blown with compressed air or simply touched with a wet finger. After blowing compressed air across the felts as a test, Dr. Millette concluded the felts released thirty asbestos fibers per cubic

centimeter of air. He also concluded that physically handling the felts and cutting the felts with a knife released breathable asbestos fibers into the air.

Christopher DePasquale, a certified industrial hygienist, stated his job evolved around identifying, recognizing, evaluating, and controlling occupational health hazards. After visiting Bowater, DePasquale testified that based on Stewart's job responsibilities and dealing with Scapa dryer felts that contained between 20 and 70% chrysotile asbestos, Stewart was significantly exposed to asbestos fibers during the time Bowater utilized Scapa asbestos-containing dryer felts. He testified Stewart's levels of occupational exposure to asbestos from Scapa's felts placed Stewart at a greater risk of developing mesothelioma and estimated that he was exposed to 0.1 to 5.0 asbestos fibers per cubic centimeter during each felt-replacement process. He testified that the 20 to 70% asbestos composition of the Scapa dryer felts created a substantial possibility that asbestos fibers would be liberated from the felts during the paper-making process and breathed in by employees.

Dr. Frank testified that while science cannot point to one specific exposure as the sole cause of mesothelioma in an individual, he explained mesothelioma is caused by an individual's cumulative exposure to all types of asbestos from all types of asbestos-containing products the individual has encountered. This theory does not suggest that every fiber is a cause of the disease, or that science points to an exact number of fibers necessary to cause mesothelioma; however, it does suggest that "as the amount accumulates in somebody's body . . . , [he or she is] more likely to get disease than if it was at a lower level." Dr. Frank stated, based on a review of Stewart's records, that through his work at Bowater (spanning roughly forty years), Stewart was exposed to asbestos from Scapa's dryer felts. He explained that Stewart's testimony indicated that at times during his employment the air would be cloudy with dust from the dryer felts and because the felts contained 20 to 70% asbestos fibers, the air contained a substantial amount of asbestos. Based on a degree of medical certainty, Dr. Frank testified that Stewart died from mesothelioma caused by his exposure to asbestos and that his exposure from Scapa's asbestos-containing dryer felts was a substantial contributing factor to his illness and subsequent death.

We find the evidence presented above is sufficient for a jury to find Scapa's asbestos-containing dryer felts were a substantial factor in Stewart developing and dying from mesothelioma. In sum, the evidence showed that (1) dryer felts release large quantities of dust during the paper-making process; (2) Stewart worked closely with the dryer felts on a regular basis, and all but one of his positions at

Bowater required him to regularly handle the dryer felts; (3) Scapa asbestos-containing felts were used at Bowater from 1963 to 1981, roughly half of Stewart's employment; (4) there is not a known safe level of asbestos exposure; and (5) Stewart regularly breathed in dust created from the paper-manufacturing process, which included asbestos fibers from the dryer felts.

## B. Cumulative Dose Testimony

Scapa argues the trial court erred in failing to grant its motion for JNOV because Stewart employed the "each and every exposure" theory of causation at trial. Scapa states that Dr. Frank explained the cumulative dose or "cumulative exposure" theory to the jury and utilized that theory in reaching his opinion as to whether Scapa's dryer felts were a substantial factor in causing Stewart's mesothelioma. Scapa conflates these two theories and claims they are inconsistent with the specific causation standard set forth in *Henderson*. We disagree.

"The 'each and every exposure' theory espouses the view that 'each and every breath' of asbestos is substantially causative of mesothelioma.'" *Jolly*, 435 S.C. at 633, 869 S.E.2d at 833 (quoting *Rost v. Ford Motor Co.*, 151 A.3d 1032, 1044 (2016)); *see also Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 846 (E.D.N.C. 2015) ("Also referred to as 'any exposure' theory, or 'single fiber' theory, it represents the viewpoint that, because science has failed to establish that any specific dosage of asbestos causes injury, every exposure to asbestos should be considered a cause of injury."). This court has recently refused to conflate the cumulative dose theory with the each and every exposure theory, concluding that an expert's opinion which states "that a certain exposure contributes to an individual's cumulative dose does not espouse the view that 'each and every breath' of asbestos is 'substantially' causative of mesothelioma or imply that one exposure meets the legal requirement for causation." *Jolly*, 435 S.C. at 635–36, 869 S.E.2d at 834. Rather, this court viewed testimony regarding a plaintiff's cumulative dose as "background information essential for the jury's understanding of medical causation, which must be based on science." *Id.* at 636, 869 S.E.2d at 834–35.

Here, Dr. Frank deployed the cumulative dose theory during his testimony, and he used it to explain how an individual's risk of developing mesothelioma or other lung disease increases as that individual's dose of asbestos increases through exposure. Dr. Frank expressly rejected the conflation of the cumulative dose theory and the each and every exposure theory when he stated that all of an individual's exposures to asbestos contribute to his likelihood of developing disease, but "that does not mean that each exposure was the one that caused the

mesothelioma."  He explained, "we never know which fiber on which day from which product did it.  But they all clearly increase the risk and ultimately have to be said to be contributory to that individual getting the disease."  The potential exists for an individual to develop lung disease from asbestos with every fiber that individual intakes, "even though they all do not actually cause the disease."  The "cumulative dose" is simply how physicians and occupational health practitioners describe the cause of mesothelioma from asbestos exposure—as the amount accumulates in the body, the likelihood of disease increases.  Dr. Frank testified that this is the medical reasoning behind the cause of all but two diseases—the AIDS virus and botulism.  Because Dr. Frank used Stewart's cumulative dose as a means to describe the medical reasoning as to how humans develop mesothelioma from asbestos exposure, we find the trial court did not err in failing to grant Scapa's JNOV motion or in allowing Dr. Frank's testimony on the cumulative dose theory at trial.  *See id.* at 635–36, 869 S.E.2d at 834 (providing an expert "[s]tating that a certain exposure contributes to an individual's cumulative dose does not espouse the view that 'each and every breath' of asbestos is 'substantially' causative of mesothelioma or imply that one exposure meets the legal requirement for causation").  Therefore, we affirm on this issue.

## II.    New Trial *Nisi* Additur

Scapa claims the trial court erred in granting Stewart's motion for a new trial *nisi* additur and increasing his survival damages from $600,000 to $1 million.  We disagree and affirm on this issue.

"The consideration of a motion for a new trial nisi additur requires the trial [court] to consider the adequacy of the verdict in light of the evidence presented."  *Vinson v. Hartley*, 324 S.C. 389, 405, 477 S.E.2d 715, 723 (Ct. App. 1996).  "When a party moves for a new trial based on a challenge that the verdict is either excessive or inadequate, the trial judge must distinguish between awards that are merely unduly liberal or conservative and awards that are actuated by passion, caprice, or prejudice."  *Riley v. Ford Motor Co.*, 414 S.C. 185, 192, 777 S.E.2d 824, 828 (2015) (quoting *Allstate Ins. Co. v. Durham*, 314 S.C. 529, 530–31, 431 S.E.2d 557, 558 (1993)).  "When the verdict indicates that the jury was unduly liberal or conservative in its view of the damages, the trial judge *alone* has the power to [alter] the verdict by the granting of a new trial nisi."  *Id.* (alteration in original) (quoting *Durham*, 314 S.C. at 531, 431 S.E.2d at 558).  "'Compelling reasons'" must be given to justify the trial court invading the jury's province in this manner."  *Id.* at 193, 777 S.E.2d at 829.

"The trial [court that] heard the evidence and is more familiar with the evidentiary atmosphere at trial possesses a better-informed view of the damages than [an appellate court.]" *Vinson*, 324 S.C. at 405, 477 S.E.2d at 723. "Motions for a new trial nisi 'are addressed to the sound discretion of the trial [court].'" *Jolly*, 435 S.C. at 654, 869 S.E.2d at 845 (quoting *Riley*, 414 S.C. at 192, 777 S.E.2d at 828). "However, the [trial] court's exercise of discretion 'is not absolute[,] and it is the duty of [appellate courts] in a proper case to review and determine whether there has been an abuse of discretion amounting to error of law.'" *Id.* at 654–55, 869 S.E.2d at 845 (second alteration in original) (quoting *Riley*, 414 S.C. at 192–93, 777 S.E.2d at 828–29). Appellate courts will not disturb the trial court's decision to grant a new trial *nisi* additur unless the trial court's findings are wholly unsupported by the evidence or the conclusions reached are controlled by an error of law. *Proctor v. Dep't of Health & Env't Control*, 368 S.C. 279, 320, 628 S.E.2d 496, 518 (Ct. App. 2006). Damages in a survival action are awarded to the benefit of the decedent's estate and include damages for medical, surgical, and hospital bills, conscious pain and suffering, and mental distress of the deceased. *Welch v. Epstein*, 342 S.C. 279, 303, 536 S.E.2d 408, 420–21 (Ct. App. 2000).

In this case, the jury returned a verdict that awarded Stewart $600,000 for his survival claim and $100,000 for his wrongful death claim. After granting Stewart's motion for new trial *nisi* additur, the trial court issued an order that increased the survival award by $400,000 to a total of $1 million. As justification for the additur, the trial court stated that both parties stipulated to Stewart's medical bills and economic damages and Scapa did not contradict Stewart's evidence of noneconomic damages consisting of pain and suffering, loss of enjoyment of life, and mental anguish. The trial court also evaluated damages awarded for pain and suffering in comparable mesothelioma cases and determined that similar circumstances justified awards ranging from $1.5 million to more than $20 million. Based on the goal of compensatory damages in South Carolina, as stated in *Clark v. Cantrell*, "to restore the injured party, as nearly as possible through the payment of money, to the same position he or she was in before the wrongful injury occurred," the trial court decided the jury's award of survival damages was insufficient. 339 S.C. 369, 378–379, 529 S.E.2d 528, 533 (2000). The trial court then itemized the jury's $600,000 survival award as being composed of $241,000 for Stewart's stipulated medical bills and $359,000 for his noneconomic damages. In conclusion, the trial court found that the noneconomic damages were insufficient and failed to accord with the stipulated evidence and fell "inextricably short of providing fitting compensation for the magnitude of [Stewart's] losses."

We find the trial court did not abuse its discretion in granting the additur. As the trial court noted, both parties stipulated that Stewart was diagnosed with malignant pleural mesothelioma and his medical bills associated with treatment were $241,822.70. It was undisputed at trial that Stewart suffered greatly as he attempted to treat his disease. His rapid deterioration and ultimate death is well documented and uncontroverted in the record. Although he had several comorbidities—diabetes, a prior heart attack, skin cancer, bladder cancer, prostate cancer, hypertension, and chronic obstructive pulmonary disease—no evidence in the record showed suffering from those health problems interacted with or amplified the pain and suffering Stewart felt from the mesothelioma.

Stewart suffered from lung infections for several years prior to his diagnosis with mesothelioma. What caused Stewart to seek further medical evaluation immediately before his diagnosis was severe pain under his armpits—pain from even a slight touch. After his diagnosis in October 2012, Stewart endured several rounds of chemotherapy and several rounds of thoracentesis, a procedure in which doctors drain excess fluid produced by the tumor. Dr. Harpole, Stewart's cardiothoracic surgeon, explained thoracentesis is unpleasant and that he could not imagine having to withstand the procedure twice a week for three months because doctors stick a large needle through the ribs into the lung to drain the excess fluid. Dr. Harpole also stated that draining the fluid hurt because the tube creates a vacuum that sucks on the lung. Stewart's chemotherapy was administered through two drugs, one of which Dr. Harpole described as a "sledge hammer." Due to the chemotherapy, Stewart lost weight from a lack of appetite, and he testified that his digestive track was dysfunctional and that he was constantly constipated.

Stewart explained during his deposition that his life was very different after his diagnosis. He could barely walk his dog and got winded by walking down the street a short distance. He could no longer complete yard work, garden, clean his house; he could no longer sleep well and had to rely on sleeping pills; he could no longer drive to meet his family in Columbia, a destination where he and his grandchildren would share a meal, visit the zoo, or go to a museum. He described how he was too exhausted to do anything and swelling with emotions, stated, "I never imagined my life would come to what it is."

Despite mesothelioma being a death sentence, Stewart was adamant he prolong his life. He underwent the aforementioned rounds of chemotherapy and thoracentesis, and he opted for a maximally invasive pleurectomy, which Dr. Harpole described as a dissection of the mesothelioma tumor and surrounding plaques from the lung. This procedure required Dr. Harpole to remove one of Stewart's ribs, collapse his

lung, remove his pericardium (heart sack), scrape the tumor off his lung, reinflate the lung, and then reconstruct his diaphragm and heart sack.

In spite of these efforts, Stewart was unable to add any substantial amount of time to his life. He was unable to complete rehabilitation after his pleurectomy. According to Dr. Harpole, it was not from lack of effort; at that point he was "just too debilitated." In August 2013, five months after surgery, Stewart succumbed to mesothelioma at the age of sixty-nine, less than a year after diagnosis.

Because both parties stipulated to Stewart's economic damages (in the form of medical bills) and the record is replete with evidence of his pain and suffering, which was unrefuted by Scapa, we find the trial court was well within its discretion in granting Stewart a new trial *nisi* additur and increasing his survival damages to $1 million. *See Riley*, 414 S.C. at 192, 777 S.E.2d at 828 ("When the verdict indicates that the jury was unduly liberal or conservative in its view of the damages, the trial judge *alone* has the power to [alter] the verdict by the granting of a new trial nisi." (quoting *Durham*, 314 S.C. at 531, 431 S.E.2d at 558)). Further, by meticulously analyzing the details of Stewart's pain and suffering, loss of enjoyment of life, and mental anguish, and in analyzing other awards for similar cases, we find the trial court provided ample justification for increasing Stewart's survival award. *See id.* at 193, 777 S.E.2d at 829 ("'Compelling reasons' must be given to justify the trial court invading the jury's province."). Accordingly, we affirm on this issue. *See Proctor*, 368 S.C. at 320, 628 S.E.2d at 518 (stating appellate courts will not disturb a trial court's decision to grant a new trial *nisi* additur unless the trial court's findings are wholly unsupported by the evidence or the conclusions reached are controlled by an error of law).

## III.    Reallocation of Settlement Proceeds

Scapa argues the trial court erred in failing to reallocate Stewart's internal apportionment of settlement proceeds between the wrongful death and survival actions, claiming the allocation did not reflect "fairness and justice." Scapa claims the trial court should have reallocated the settlement funds "in a manner reasonable under the facts." We disagree and affirm on this issue.

"A non[]settling defendant is entitled to credit for the amount paid by another defendant who settles for the same cause of action." *Rutland v. S.C. Dep't of Transp.*, 400 S.C. 209, 216, 734 S.E.2d 142, 145 (2012); *see also Riley*, 414 S.C. at 195, 777 S.E.2d at 830 ("The right to setoff has existed at common law in South Carolina for over 100 years."). "The reason for allowing such a credit is to prevent

an injured person from obtaining a second recovery of that part of the amount of damages sustained which has already been paid to him." *Welch*, 342 S.C. at 312, 536 S.E.2d at 425. "In other words, there can be only one satisfaction for an injury or wrong." *Id.* In 1988, South Carolina codified these equitable principles as part of the South Carolina Contribution Among Tortfeasors Act.[3]

"The trial court's jurisdiction to set off one judgment against another is equitable in nature and should be exercised when necessary to provide justice between the parties." *Welch*, 342 S.C. at 313, 536 S.E.2d at 425. "Despite a defendant's entitlement to setoff, whether at common law or under section 15-38-50, any 'reduction in the judgment must be from a settlement for the same cause of action.'" *Riley*, 414 S.C. at 196, 777 S.E.2d at 830 (quoting *Hawkins v. Pathology Assocs. of Greenville, P.A.*, 330 S.C. 92, 113, 498 S.E.2d 395, 407 (Ct. App. 1998)). "Thus, where a settlement involves more than one claim, the allocation of settlement proceeds between various causes of action impacts the amount a non[]settling defendant may be entitled to offset." *Id.*

Here, upon an in camera review of the releases signed by Stewart and the settling defendants, the trial court verified Stewart received $1,036,000 in pretrial settlements. Stewart conceded Scapa was entitled to setoff and the trial court granted Scapa's motion for setoff. The trial court also determined that Stewart had internally allocated 20% of each settlement to the survival cause of action and 80% to the wrongful death cause of action. This corresponded with settlement totals of $207,200 for the survival action and $828,000 for the wrongful death action. The court then applied the setoff rules and reduced the survival award of $1 million to $792,800 and negated the wrongful death award.

---

[3] In pertinent part, section 15-38-50 (2005 & Supp. 2021) reads as follows:

> When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death . . . it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater . . . .

Scapa now requests this court to find the trial court erred in denying its request to reallocate Stewart's internal apportionment to 90% for the survival cause of action and 10% for the wrongful death cause of action as this would be more "reasonable under the facts" and not just advantageous to Scapa.[4]  We find this argument is without merit as Scapa points only to the fact that the trial court favored Stewart's survival action in granting the additur.  *See In re Wells*, 43 S.C. 477, 485, 21 S.E. 334, 337 (1895) (finding the party seeking departure from the application of standard setoff rules bears the burden of proof and must be "prepared to justify such [reallocation] as fair, bona fide, and just").  Scapa maintains the trial court finding that the evidence presented at trial warranted an increase of the survival claim to make it 90% of the total damages justified a reallocation of Stewart's settlement proceeds to match the respective award percentages—90% for survival and 10% for wrongful death.

Scapa's argument stands in contrast to the principle that plaintiffs who settle with defendants gain control and leverage in relation to nonsettling defendants—control that is often reflected in the plaintiff's ability to apportion settlement proceeds in a manner most advantageous to it.  *See Riley*, 414 S.C. at 197, 777 S.E.2d at 831.  As the *Riley* court noted,

> Settlements are not designed to benefit nonsettling third parties.  They are instead created by the settling parties in the interests of [settling] parties.  If the position of a nonsettling defendant is worsened by the terms of a settlement, this is the consequence of a refusal to settle.  A defendant who fails to bargain is not rewarded with the privilege of fashioning and ultimately extracting a benefit from the decisions of those who do.

*Id.* (quoting *Lard v. AM/FM Ohio, Inc.*, 901 N.E.2d 1006, 1018 (Ill. App. Ct. 2009)).

Scapa's "percentages-based allocation" argument is an attempt to refashion a disadvantageous allocation of the settlement proceeds.  Merely because Stewart's internal allocation of the proceeds is not in Scapa's best interests is "insufficient to justify [an] appellate reapportionment for the sole purpose of benefitting [a

---

[4] Indeed, such a reallocation of the settlement proceeds would be greatly advantageous to Scapa and would result in a substantial discount, costing Scapa only $67,600 in total damages to Stewart.  A savings of roughly $725,200.

nonsettling party]." *Id.* Because we do not perceive the effect of setoff based on Stewart's internal allocation as improper, unreasonable under the facts of this case, or unfair simply because it favored Stewart and did not reflect percentages that corresponded with the percentage of each award, we find the trial court did not err in denying Scapa's motion to reallocate Stewart's settlement proceeds for the purpose of setoff. *See id.* ("If the position of a nonsettling defendant is worsened by the terms of a settlement, this is the consequence of a refusal to settle. A defendant who fails to bargain is not rewarded with the privilege of fashioning and ultimately extracting a benefit from the decisions of those who do." (quoting *Lard*, 901 N.E.2d at 1019)). Therefore, we affirm on this issue.

## IV. Bankruptcy Claims

Scapa argues the trial court erred in refusing to admit claims Stewart filed with bankruptcy trusts established by companies that manufactured asbestos-containing products used at Bowater. Scapa asserts the claims were admissible as an admission of a party opponent and under *Smith v. Tiffany.*[5] In holding the claims inadmissible, Scapa contends the trial court "made it impossible for Scapa to try its empty-chair defense." We disagree and affirm on this issue.

The admission or exclusion of evidence is within the sound discretion of the trial court, and the court's decision will not be disturbed absent an abuse of such discretion. *Fields v. Reg. Med. Ctr. Orangeburg*, 363 S.C. 19, 25, 609 S.E.2d 506, 509 (2005). An abuse of discretion occurs when the trial court's decision is based on an error of law or factual conclusion that lacks any evidentiary support within the record. *Id.* at 26, 609 S.E.2d at 509.

Here, during a pretrial motion, Scapa sought approval from the trial court to admit claims Stewart submitted to bankrupt companies' trusts. Scapa contended it only sought to admit the claims as a party admission of asbestos exposure to other companies' products, not to prove Stewart requested or may have received money from those companies. The trial court decided the issue under *Smith* and denied Scapa's request. In making its ruling under *Smith*, the court found that evidence showing the existence of settling defendants, "other pots of money," and claims against other parties was inadmissible during trial and was properly considered during the setoff portion of trial. In differentiating between Scapa's request to admit the bankruptcy claims with an attempt to establish an empty-chair defense, the court noted the empty chair defense is an attempt to introduce direct evidence

_____

[5] 419 S.C. 548, 799 S.E.2d 479 (2017).

of the liability of a bankrupt company for the injuries Stewart suffered—evidence the court would admit. The trial court determined Scapa attempted "to put before the jury the fact that a bankruptcy claim was made on the altar of saying that it's an admission of a party opponent."

Our appellate courts hold fast to the longstanding principle that evidence of conduct or statements made in compromise negotiations is inadmissible because the law favors compromise. *See QHG of Lake City, Inc. v. McCutcheon*, 360 S.C. 196, 209, 600 S.E.2d 105, 111 (Ct. App. 2004). Under Rule 408, SCRE,

> Evidence of . . . accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

We find Stewart's trust claims are analogous to an offer or promise to accept compensation for his contact with the bankrupt organizations' asbestos-containing products. In other words, Stewart's claims are an offer to compromise. These settlement trusts are unique in that Stewart's submission of a claim, if he is deemed qualified by the trustee, constitutes his acceptance of whatever amount the trust offers as settlement. *See Oddo v. Asbestos Corp. Ltd.*, 173 So. 3d 1192, 1217 (La. Ct. App. 2015) (holding the trial court did not err in excluding bankruptcy trust claims filed by a mesothelioma patient). Although these claims could amount to a party admission, this type of admission—made for the purpose of settling a claim—is precisely what Rule 408, SCRE, was designed to exclude at trial. The purpose of Rule 408 is to encourage free and unfettered negotiation while providing parties peace of mind that their negotiations—concessions, denials, admissions, and claim amounts—cannot be used against them *to prove liability for the disputed* claims *or its amount* at trial. *See* Rule 408, SCRE ("Evidence

of . . . accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount."); *McCutcheon*, 360 S.C. at 209, 600 S.E.2d at 111 ("Because the law favors compromises, our appellate courts have long held that testimony as to negotiations and offers to compromise are inadmissible for proving liability."); *Hunter v. Hyder*, 236 S.C. 378, 387, 114 S.E.2d 493, 497 (1960) ("This Court has held that compromises are favored and evidence of an offer or attempt to compromise or settle a matter in dispute cannot be given in evidence against the party by whom such offer or attempt was made."); *Fesmire v. Digh*, 385 S.C. 296, 307–08, 683 S.E.2d 803, 809 (Ct. App. 2009) ("[Rule 408, SCRE] contemplates that the parties need to feel free to make certain assumptions for the purpose of settlement negotiations and that those statements are assumed by the author to be true only for the purpose of compromise negotiations.").

Further, we find that Scapa's empty-chair defense argument fails to grasp the nature and purpose of these unique trusts and the empty-chair defense. "The empty-chair defense is the defendant's 'right to assert another potential tortfeasor, *whether a party or not*, contributed to the alleged injury or damages' and was codified in the Uniform Contribution Among Tortfeasors Act (the Act) at section 15-38-15 of the South Carolina Code (Supp. 2020)." *Dawkins v. Sell*, 434 S.C. 572, 590, 865 S.E.2d 1, 10 (Ct. App. 2021) (quoting *Smith*, 419 S.C. at 557, 799 S.E.2d at 484). In seeking to establish an empty-chair defense, a defendant must assign fault for the plaintiff's injury to another party by providing evidence to the fact-finder that is sufficient for it to determine whether the party's "actions were the cause of the plaintiff's injuries." *Machin v. Carus Corp.*, 419 S.C. 527, 542–43, 799 S.E.2d 468, 476 (2017). Here, the settlement claims Stewart filed would not provide evidence to the jury that is sufficient for it to determine if the bankrupt companies' products were the cause of Stewart's mesothelioma. The claims would only show that Stewart could have been exposed to their products and that he was seeking compensation from the trusts for his mesothelioma. The claims do not in themselves provide a link between Stewart's mesothelioma and the bankrupt companies' products.

Moreover, contrary to Scapa's argument on appeal, the trial court's ruling in no way "made it impossible for Scapa to try its empty-chair defense." The record is replete with instances of Scapa interrogating witnesses regarding other companies that produced asbestos-containing dryer felts, insulation, and valves used at Bowater. Scapa named thirteen manufacturers of asbestos-containing products used at Bowater during Stewart's employment at trial. Therefore, we find the trial

court did not err in refusing to admit the bankruptcy trust claims and did not prevent Scapa from trying its empty-chair defense.

**CONCLUSION**

Accordingly, the trial court's rulings are

**AFFIRMED.**

**KONDUROS and VINSON, JJ., concur.**