# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Wedgewood Condominium Association, Respondent,

v.

Centex Homes, a Nevada General Partnership; Balfour Beatty Construction, LLC as Successor by Merger to Centex Construction Company, Inc.; and Centex Construction, LLC; Crescent Engineering, Inc., Defendants,

Of which Centex Homes, a Nevada General Partnership; Balfour Beatty Construction, LLC as Successor by Merger to Centex Construction Company, Inc., and Centex Construction, LLC, are the Appellants.

and

Centex Homes, a Nevada General Partnership, Third-Party Plaintiff,

v.

Right Way Construction, Inc. a/k/a RWG, Inc. a/k/a Right Way Group, Inc. a/k/a RWGR, Inc.; Frank Harris d/b/a Frank Harris Construction a/k/a/ F. Harris Construction a/k/a Harris Drywall; Builders First Source-South East Group, LLC; Stock Building Supply, LLC f/k/a Stock Building Supply, Inc. f/k/a Carolina Builders Corporation; Michael D. Brownlee d/b/a Carolina Drywall & Interiors; Carolina Drywall & Interior, Inc., a/k/a Carolina Drywall & Interiors, Inc. a/k/a Carolina Drywall Contractors, Inc.; Roof Doctor of the Carolinas, Inc.; John D. Frazier d/b/a and/or a/k/a Roof Doctor and/or Roof Doctor of the Carolinas and/or Roof Doctor of the Carolinas, Inc.; Steven Bosch d/b/a The Roofer Man; Tri-City Insulation and Building Products of Myrtle

Beach, Inc.; Martin Mata d/b/a Martin Masonry, Inc.; Martin Masonry, Inc.; BR Brick & Masonry, Inc.; BR Brick & Masonry, LP f/k/a BR Brick & Masonry, Inc.; Unicon Concrete, LLC; Seno's Cleaning Services; Rice Planter Carpets, Inc. n/k/a Creative Touch Interiors, Inc., Floors, Inc. Successor By Merger to Rice Planter Carpets, Inc.; Carpets by Kendall, Inc.; Reliable Floor Systems, Inc.; TNT Painting; Paint with Pride a/k/a Painting with Pride; William Evans d/b/a Top Notch Painters; Morningstar Consultants, Inc.; MI Windows and Doors, LLC; Michael Dawson d/b/a Michael Dawson Construction, Inc.; Vereen Concrete Co. Inc.; AK Construction Inc. a/k/a AK Framing and Siding Co.; and AK United, Inc. f/k/a AK Construction Inc., Third-Party Defendants.

Appellate Case No. 2023-001132

————————

Appeal From Horry County
Carmen T. Mullen, Circuit Court Judge

————————

Opinion No. 6124
Heard June 10, 2025 – Filed September 24, 2025

————————

**AFFIRMED**

————————

Thomas C. Hildebrand, Jr. and William Green DesChamps, IV, both of Parker Poe Adams & Bernstein, LLP, of Charleston; Katon Edwards Dawson, Jr., of Parker Poe Adams & Bernstein, LLP, of Columbia; and Jeffrey A. Turner and Stephanie A. Douglas, both of Bush Seyferth, PLLC, of Troy, Michigan, all for Appellants.

Gene McCain Connell, Jr. and Lawrence Sidney Connor, IV, both of Kelaher Connell & Connor, PC, of Surfside Beach, and Stacy L. Stanley, of Stanley Law Firm, LLC, of Little River, all for Respondent.

---

**KONDUROS, J.:**  This condominium construction defect case centers primarily on whether the case was brought in a timely fashion under the statute of limitations and statute of repose.  The use of unlicensed subcontractors is also an issue.  After a five-day jury trial, Wedgewood Condominium Association (Wedgewood) received a $6.75 million jury verdict in its favor.  Centex Homes; Balfour Beatty Construction, LLC; and Centex Construction, LLC (collectively, Centex) appeal.  We affirm.

## FACTS/PROCEDURAL HISTORY

Centex constructed the nine-building, eleven-unit condominium complex in from 2000 to 2001.  Wedgewood filed a construction defect lawsuit against Centex in 2018.  In its complaint, Wedgewood alleged multiple claims for damages including those stemming from (1) improper installation of rough opening flashing and window sills, flashing at window heads, vertical fiber-cement siding panels, brick veneer ties, roof underlayment, metal drip edge, and accessible ramps within vehicle access aisles; (2) premature deterioration of self-adhered flashing membrane, vinyl windows, and insulated glass units; (3) improper attachment of horizontal lap fiber-cement siding, roof shingles, roof shingle starter strip, and metal fascia; (4) inadequate support of steel lintels above windows; (5) inadequate and missing through-wall flashing at the brick veneer; (6) inadequate protection of untreated wood furring members; (7) improper and incomplete installation of flashing and weather-resistive barrier; (8) incomplete installation and damaged waterproofing on front walkways and stair towers; (9) inadequate fireproofing of structural members along front walkways and rear balconies; and (10) improper stair riser dimensions.

Centex filed a motion for summary judgment based on the statute of limitations.  In its supporting memoranda, Centex included what it termed "undisputed facts" with excerpts of minutes from Wedgewood Board of Directors' (the Board) meetings discussing various issues with wood rot, mold, and water intrusion beginning in 2003.  Among these was an entry from an October 28, 2006 meeting discussing leaking windows in the complex.

**B. Update to Repairs on Buildings 1, 9 and 8**

> Chuck Gornick [the property manager] stated that the
> repairs to Building 1 have been completed, Building 9 is
> finishing up and Building 8 will be next. Mr. Gornick
> stated that it appears that in windows that are double and
> triple hung, there is a gap at the top of the strip between
> the windows. It is believed that this is where the leaking
> is occurring. Mr. Gornick recommended having an
> engineering expert look at these windows to try and
> determine if this is a Centex problem. The Board
> recommended notifying Centex that an expert would be
> looking at the windows. Chuck Gornick stated that he
> would keep the Board posted on all developments.

The circuit court granted Centex's summary judgment motion based on the statute of limitations regarding plumbing/sewer installation defects and defects in accessibility ramps in the parking areas. Its order found that after one of the units experienced a sewer backup on multiple occasions, the sewer lines under the units were inspected causing "the plumbing repair company to recommend [Wedgewood] change the height of the pipe in order to improve drainage and prevent further backups." The order further noted the board of directors included in its November 2, 2012 meeting minutes that the cause of the sewer issues may be "due to poor installation on the builder's part." The circuit court also found issues with the ramps and parking lots were open and obvious. However, it denied Centex's summary judgment motion as to any other claims.

At trial, Wedgewood introduced some of the exhibits it had presented at summary judgment, including the minutes of the October 28, 2006 Board meeting, and called three witnesses. Randall Spencer was a resident and owner in the community and was a member of the Board for 21 years. He testified the Board's function was to make sure maintenance was performed on the complex and that its bills were paid. He indicated the Board relied on property management companies and their employees to inform them of any issues regarding maintenance and to make recommendations as to how those could or should be handled. With regard to specific issues, Spencer indicated the Board meeting minutes would be the most accurate reflection of what the Board knew and when and what actions it took. He stated he did not believe the information in the October 2006 Board meeting minutes about the gap in the double- and triple-hung windows put the Board on notice of all the defects in the construction because that was limited to water leaks

around windows and it was simply the project manager's opinion. Spencer was shown multiple bills illustrating that the Board had spent approximately $83,000 in the year 2010 replacing the exterior trim, posts, and drywall around the buildings, apparently due to rot. Centex pointed out that some of these repairs were made after the Board had the exterior carpets removed from walkways but chose not to replace the associated membrane as recommended by the manufacturer. Spencer also acknowledged that a complex-wide recaulking or trim repainting was never undertaken; instead, repairs were done as necessary.

Ross Clements, a forensic engineer, testified as Wedgewood's expert regarding the construction defects at the complex. Clements stated he did destructive testing, as is common in these types of cases. He testified he found numerous defects and code violations that, in his opinion, had led to water intrusion and resulting rot in the units, common areas, and behind the sheathing of the buildings. Clements also testified that during discovery, documents of Morningstar Consultants, a construction consultant used by Centex during the building of the complex, reported some of the issues Clements found in his investigation. To conclude his direct testimony, Clements stated:

> Just to summarize what we've gone over the last several hours, the construction defects have left the buildings in a substandard condition allowing water intrusion and reducing building safety and performance. The construction defects represent violations of the applicable building codes, industry standards, and manufacturers' instructions that were applicable at the time of the construction for the contractor to follow. The construction defects have caused hidden damages that were revealed through my destructive testing.

On cross-examination, Clements was asked about the Board's replacing of $83,000 in window trim in 2010 and its decision not to replace the carpet membrane. When asked about comments noted in the October 2006 Board meeting minutes regarding the window gap, Clements replied that Gornick's statement was "not representative of all of the issues we['ve] talked about here today."

Bob Gallagher testified on Wedgewood's behalf regarding the cost to make the repairs to the complex based on Clements's recommendations. This total was $9,376,719.85 and included the costs for labor, materials, and mobilization, meaning trucks, scaffolding, and other support items. On cross-examination,

Centex elicited multiple ways Gallagher's total repair cost estimate might be reduced if alternative repair methods, as opposed to Clements's total replacement approach, were used. Gallagher testified he based his estimate on Clements's recommendations, not on his own opinion as to what repairs were needed.

At the close of Wedgewood's case, Centex made a motion for directed verdict based on the statute of limitations and the statute of repose. The circuit court denied this motion without a providing a specific basis for doing so.

Centex offered four witnesses, including Jeremy Martin, an area construction manager with Centex who had worked for the company for almost twenty-five years. He testified regarding monthly technical training Centex provides for field managers. He also indicated the company has "toolbox talks" and "tailgate talks" on a regular basis to discuss issues in the industry and things it is observing in the field. Martin did not testify he was involved with the actual construction at the complex, but generally testified to the inspections process prior to closing on homes with buyers. He indicated Centex had used Morningstar Consultants for an extra layer of inspection at the complex.

Bob Carter testified as Centex's forensic engineer. Carter acknowledged certain deviations from manufacturers' instructions and code violations at the complex. However, the overall message of his testimony was that these defects were generally minor, did not affect the integrity of the complex to the degree Clements suggested, and are simply a part of doing construction in the real world. He further stated the repairs suggested by Clements far exceeded what was required.

Skip Lewis testified for Centex as an expert in structural engineering with a focus on the shear walls in the complex. He testified he agreed with Clements in that the walls were not constructed with strict compliance to the 1999 plans, but that they were sound and code compliant as they would withstand very high wind speeds. He also disagreed that the attic trusses were structurally unsatisfactory as Clements had suggested.

Steve Watkins testified as Centex's expert general contractor. Based on the scope of work proposed by Carter, Watkins estimated repair costs would total $384,963.84.

At the conclusion of Centex's case, it again moved for directed verdict, primarily focusing on the statute of repose and a lack of evidence to establish gross

negligence. The circuit court and counsel veered into discussions regarding jury charges without specifically addressing the directed verdict motion.

In closing arguments, Wedgewood highlighted the admitted evidence of building code violations to support its claim for gross negligence. Centex argued to the jury the statute of limitations as well as a lack of evidence proving gross negligence. It also argued that Clements's recommended repairs were actually complete tear-outs and replacements that simply were unnecessary to remedy the issues in the complex. Centex pointed out that building inspectors were satisfied with code compliance to the point of giving it a certificate of occupancy at the completion of the build. On reply, Wedgewood continued to pursue its code violation and gross negligence argument, stating:

> The Statute of Repose. He almost got it right, but he didn't tell you the whole thing. Fancy word: Repose. It means that you can bring a lawsuit after a certain period of time, and you can bring a lawsuit after a certain period of time after 13 years if -- if you can prove violations of building codes, and that is what we've done here.
>
> [CENTEX]: Your Honor –
>
> THE COURT: Objection?
>
> [CENTEX]: Yes, ma'am.
>
> THE COURT: What?
>
> [CENTEX]: The code section said they –
>
> THE COURT: You can't testify. You can only do one[-]word objections. Overruled. You can continue.

When the circuit court charged the jury, it stated regarding the statute of limitations:

> Now, the Centex entities also raised the Statute of Limitations as a defense, which is a part of the law of our state. As adopted by South

Carolina, the discovery rule states that a Statute
of Limitations begins to run when a claim
reasonably ought to have been discovered.  The
Statute of Limitations at the Wedgewood Condominium
Association's claim is three years.

A claim ought to have been discovered if an
injured party, the homeowners['] association, either
knows or should have known an action arises from
wrongful conduct through the exercise of reasonable
due diligence that some claim against another party
might exist.

The law requires to exercise reasonable due diligence
that an injured party act with some promptness, where
the facts or circumstances would put a person of common
knowledge on notice that some right of his has been
violated, or that a claim against another party may exist.
At that point, the clock starts. The clock is not delayed
until advice of counsel is sought or a full-blown theory of
recovery is developed. The jury must apply the discovery
rule to determine whether Wedgewood Condominium
Association filed this lawsuit on time.

The circuit court also charged the statute of repose, gross negligence, and code
violations in relation to gross negligence.  The parties agreed to a verdict form that
posed only two questions.  First, did the jury find in favor of Wedgewood or
Centex as to the claim of gross negligence?  Second, and only if the jury found in
favor of Wedgewood, the verdict form provided a blank space for any actual
damages.

The jury found in favor of Wedgewood in the amount of $6.75 million.  Centex
filed a motion for judgment notwithstanding the verdict (JNOV) based on both the
statute of limitations and the statute of repose.  A hearing was held on the motion.
In its ruling, the circuit court essentially deferred to the jury's verdict.

The statute of limitations, like I said, I -- I just think it's a
question of facts as to all the issues.  I just didn't direct a
verdict -- I'm sorry, that I didn't grant summary judgment
on.  I think in construction cases, you know, obviously,

you almost always look to the homeowner's association meeting minutes to see what they discussed. And you know, then you look and see what was discussed. And along with that, you also look to see what the cost of repairs were and what kind of repairs they did. And you know, I don't find that in this case, based on the extent [of] damage, that those were anything more than just maintenance and just trying to, you know, do what they needed to do. And I don't think it put them on notice necessarily. Or if it did, it was a question of the fact for the jury to determine that and not me. I just think that that was within the -- I think it's the jury's purview. Again, I grant summary judgment on the ones that I said absolutely not, that there's no way they didn't know. And for the rest of it, I think it was a jury issue.

This appeal followed.

## LAW/ANALYSIS

### I. Preservation

As an initial matter, Wedgewood asserts Centex did not preserve its argument regarding the statute of limitations.[1] We disagree.

---

[1] Conversely, Centex argues in its reply brief that Wedgewood waived its preservation argument because it did not raise this point to the circuit court at the JNOV hearing. Wedgewood acknowledged the statute of limitations issues had been discussed throughout the case. However, the crux of Wedgewood's argument is that Centex failed to obtain a ruling. Although Centex's argument does not entirely miss the mark, it is too weak to warrant deciding the statute of limitations issue on the ground of preservation when this was not a paramount issue throughout the litigation. *See Herron v. Century BMW*, 395 S.C. 461, 465, 719 S.E.2d 640, 642 (2011) ("Issue preservation rules are designed to give the trial court a fair opportunity to rule on the issues, and thus provide us with a platform for meaningful appellate review." (*quoting Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp.*, 368 S.C. 342, 373, 628 S.E.2d 902, 919 (Ct. App. 2006)); *id.* ("Imposing such a requirement on the appellant 'is meant to enable the lower court to rule properly after it has considered all relevant facts, law, and arguments.'" (*quoting I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 422, 526

Centex moved for summary judgment based on the statute of limitations as to all the claims against it. The circuit court granted the motion as to any sewer issues and any issues regarding access ramps in the parking areas. The circuit court denied summary judgment as to the other alleged damages without explanation. At trial, Centex raised the statute of limitations in its motion for directed verdict at the conclusion of Wedgewood's case. Centex argued, "What we have here and what you heard were some homeowners in 2006 found out about some problems. If they made an investigation then, those problems would have been discovered and corrected very easily. So[,] I think it is barred by the Statute of Limitations."

Much of the discussion then centered on Centex's position that the statute of repose barred recovery because Wedgewood had shown no evidence of gross negligence, or more specifically some sort of intentional bad conduct beyond the code violations testified to by the experts. Much discussion also concerned the Unfair Trade Practices Act claim and whether it fell within the statute of repose. Still, Centex raised the statute of limitations again prior to concluding its argument, stating:

> So all of these, again, are trumped by the Statute of Repose, but even individually, I don't think there has been evidence to support them. The Statute of Limitations, I would also move on that. The homeowners noticed these deficiencies back in 2006. If they investigated those and hired the engineer who was recommended, I think that they would have found these.

At the conclusion of all evidence, Centex again moved for directed verdict on the statute of repose. However, the discussion between Centex, Wedgewood, and the circuit court quickly morphed into a discussion regarding jury charges and the verdict form as opposed to the motion for directed verdict. Within that discussion the circuit court stated: "As of now, I have the Statute of Limitations in our charge

S.E.2d 716, 724 (2000)); *see also Johnson v. Roberts*, 422 S.C. 406, 411, 812 S.E.2d 207, 210 (Ct. App. 2018), *aff'd*, 427 S.C. 258, 830 S.E.2d 910 (2019) ("Our supreme court has cautioned that issue preservation 'is not a "gotcha" game aimed at embarrassing attorneys or harming litigants.'" (quoting *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012)).

because I still think it's applicable. You moved for summary judgment on it."
Centex replied, "He should get that I think."

Further discussion ensued about jury charges and the verdict form, and
Wedgewood and the circuit court appeared to understand that Centex had admitted
liability, as to at least simple negligence. Centex argued against that conclusion
and again raised the statute of limitations argument:

> THE COURT: I need to know this: Do you admit that
> Centex proximately caused any damages from [its]
> negligence?
>
> CENTEX: No. And I'll tell you why. One, the Statute of
> Limitations. The plaintiffs knew back in 2000 -- and this
> is the one we struggled with so much -- they were told in
> 2006 by the homeowners' association, look, there are
> issues with this building, and you need to hire an
> engineer to inspect them and determine if these are
> Centex's problems.
>
> THE COURT: *So you are saying Statute of Limitations is
> a pure affirmative defense to negligence?*
>
> CENTEX: *Yes, ma'am. Absolutely.* And then by
> [Wedgewood's] own property manager's admission, in
> 2016 they said, We told you back in 2006, and now
> we've got a bigger problem. You all need to come out
> and do exactly what we told you to do back in 2006. So,
> basically, if they would have done it in 2006, what they
> finally decided to do in 2016, all of these problems would
> have been discovered. I think that that is -- *if we're going
> to get there*, that is something for the jury to consider.

(emphasis added).

This discussion continued regarding whether the circuit court would charge the
statute of repose and the court stated: "My concern is I haven't seen where the
Statute of Repose ever gets charged. I mean, obviously, the Statute of Limitation
does, and you moved on it, but . . . ."

After the jury returned its verdict, Centex made a motion for JNOV and presented a clear and cogent argument regarding the statute of limitations. Following a hearing, the circuit court orally denied the motion and later memorialized this denial in a Form 4 order.

Wedgewood contends Centex's statute of limitations argument is not preserved for appellate review because it failed to renew its directed verdict motion on that basis after the close of all evidence and never obtained a ruling from the circuit court on that issue. However, Centex brought the issue to the circuit court's attention more than once during these discussions. Wedgewood is correct that Centex did not explicitly state: "We move for directed verdict based on the statute of limitations." However, the record shows the circuit court was well aware of Centex's argument regarding the statute of limitations and was sending the matter to the jury. In doing so, it effectively ruled it was denying relief on the basis of the statute of limitations. Furthermore, Rule 50(b), SCRCP, provides: "Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." Again, "issue preservation 'is not a "gotcha" game aimed at embarrassing attorneys or harming litigants.'" *Johnson*, 422 S.C. at 411, 812 S.E.2d at 210 (quoting *Atl. Coast Builders*, 398 S.C. at 329, 730 S.E.2d at 285). The matter was thoroughly discussed throughout the trial and later at the JNOV stage with a clear ruling. Consequently, Centex's statute of limitations argument is preserved.

## II.     Statute of Limitations

On the merits, Centex argues the circuit court erred in denying its directed verdict and JNOV motions because Wedgewood's lawsuit was commenced after the statute of limitations on its claims had run. We disagree.

"Statutes of limitations embody important public policy considerations in that they stimulate activity, punish negligence, and promote repose by giving security and stability to human affairs." *Allwin v. Russ Cooper Assocs., Inc.*, 426 S.C. 1, 12, 825 S.E.2d 707, 712 (Ct. App. 2019) (quoting *Moates v. Bobb*, 322 S.C. 172, 176, 470 S.E.2d 402, 404 (Ct. App. 1996)). "One purpose of a statute of limitations is 'to relieve the courts of the burden of trying stale claims when a plaintiff has slept on his rights.'" *Moates*, 322 S.C. at 176, 470 S.E.2d at 404 (quoting *McKinney v. CSX Transp., Inc.*, 298 S.C. 47, 49-50, 378 S.E.2d 69, 70 (Ct. App. 1989)). "Another purpose of the statute of limitations is to protect potential defendants from protracted fear of litigation." *Id.* "The cornerstone policy consideration

underlying statutes of limitations is the laudable goal of law to promote and achieve finality in litigation." *Allwin*, 426 S.C. at 12, 825 S.E.2d at 713 (quoting *Carolina Marine Handling, Inc. v. Lasch*, 363 S.C. 169, 175, 609 S.E.2d 548, 552 (Ct. App. 2005)).

Section 15-3-530 of the South Carolina Code (2005) governs the claims in this case. *See* S.C. Code Ann. § 15-3-530 (1), (5) (prescribing a three-year statute of limitations for "action[s] upon a contract" and injury to the rights of another, "not arising on contract" respectively). For construction defect claims, the statute of limitations begins to run from the date of discovery. *McAlhany v. Carter*, 415 S.C. 54, 63, 781 S.E.2d 105, 110 (Ct. App. 2015). "The statute runs from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct." *Id*. (quoting *Dean v. Ruscon Corp.*, 321 S.C. 360, 363, 468 S.E.2d 645, 647 (1996). "The exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Id*. (quoting *Epstein v. Brown*, 363 S.C. 372, 376, 610 S.E.2d 816, 818 (2005). "[T]he fact that the injured party may not comprehend the full extent of the damage is immaterial." *Id*. (quoting *Dean*, 321 S.C. at 364, 468 S.E.2d at 647). "The date on which discovery should have been made is an objective, not subjective, question." *Id*. (quoting *Kreutner v. David*, 320 S.C. 283, 285, 465 S.E.2d 88, 90 (1995)).

The circuit court granted summary judgment for Centex as to Wedgewood's plumbing claims and claims regarding the ramps in the complex based on the Board minutes stating the issue may be "due to poor installation on the builder's part" and the court's finding that the ramp issues were open and obvious. The court found those issues were sufficiently known such that Wedgewood was on notice of a potential claim. In addition to the evidence supporting *that* determination, Centex provided numerous citations to the minutes of the Board discussing water damage, rot, failing ceilings and flooring, window leaks, and even references to other Centex-built complexes experiencing similar issues. Included therein were the 2006 Board meeting minutes in which the property manager discussed leaking windows and suggested contacting an engineer to evaluate the issue as it may be a "Centex problem." Nevertheless, the circuit court denied summary judgment as to claims related to windows or other water damage without explanation.

The case law on this issue is mixed, with determinations regarding notice being extremely fact specific. In some cases, the considered rulings occurred at the

summary judgment stage and in others at the directed verdict or JNOV stages of the proceedings. *See Dean*, 321 S.C. at 365-66, 468 S.E.2d at 648 (affirming the circuit court's grant of directed verdict when the plaintiff initially discovered a crack in her building instead of when a second crack and subsequent damage appeared because "the fact that [the plaintiff] may not have comprehended in 1984 that the original crack would expand causing the building to ultimately buckle is immaterial"); *Barr v. City of Rock Hill*, 330 S.C. 640, 645-46, 500 S.E.2d 157, 160 (Ct. App. 1998) (affirming the grant of summary judgment when four annual termite reports indicated excessive moisture in a plaintiff's home's crawl space and an engineering report two years later revealed numerous defects unrelated to moisture and the plaintiff filed suit two years after that report); *Allwin*, 426 S.C. at 20-21, 825 S.E.2d at 717 (affirming the grant of summary judgment when the plaintiff was made aware of water intrusion, roofing defects, and further construction deficiencies despite the plaintiff's pursuing of "a conservative but conscious course of action in response to conflicting opinions" about the extent of the damage).

Here, Centex challenges the circuit court's denial of its JNOV motions. "In considering a JNOV, the [circuit court] is concerned with the existence of evidence, not its weight," and "neither [an appellate] court, nor the [circuit] court has authority to decide credibility issues or to resolve conflicts in the testimony or the evidence." *Curcio v. Caterpillar, Inc.*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003) (citations omitted). "The jury's verdict must be upheld unless no evidence reasonably supports the jury's findings." *Id.* "A motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict." *Gastineau v. Murphy*, 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998).

At trial, Centex focused heavily on the "smoking gun" statement from the 2006 Board meeting minutes about double- and triple-hung windows, arguing the Board was put on notice of a window defect in 2006 and, had it acted on that notice, it would have triggered a full-blown investigation revealing all the damages alleged in the lawsuit. On cross-examination, Spencer was asked about that point:

> Q. Okay. If the board would have hired an engineering expert back in 2006 instead of waiting ten years later, then this whole thing -- whatever is causing the problems you say existed with the windows -- could have been fixed back in 2006 rather than waiting until now, right?

A. There was not a need that we saw to hire an engineer in 2006 to look at windows. Mr. Gornet is our property manager. It is not uncommon in a board meeting for property managers to throw offhand comments. It doesn't necessarily mean that the board should act on them.

On redirect, Spencer testified that the Board did not know about the original construction defects until 2016.

Centex also asked Clements about the same statement regarding the double- and triple hung window in the Board's 2006 minutes:

Q. You testified about a lot of deficiencies here today. My question to you is: If in 2006-- let me ask you this: Were you here this morning to hear the testimony of Mr. Spencer?

A. Yes.

Q. And did you hear him talk about the board meeting where it was discussed by the property manager, and recommended by the property manager, that, look, there is a problem with these windows and you all need to have it investigated by an engineer to determine whether it relates to original construction or not? Did you hear that?

A. Yes.

Q. If you had done that inspection back in 2006, and the board followed that recommendation and hired you or an engineer who do these inspections, is there any reason why any of these claimed deficiencies that you testified about here today would not have been discovered?

A. I don't believe that is the case because what they were talking about this morning is just described as a gap at the top of a window. It's not representative of all of the issues we talked about here today.

Q. I understand, but if an engineer was called out and said, look, we need you to look at this, that engineer could have looked at that and very easily looked at all of the other deficiencies and made a full investigation about everything you found?

A. I don't think anyone would reasonably think you would go from a small gap being described at a window and that would be translated into a full investigation the way -- like what I was hired to do.

Q. You are a forensic architect?

A. Yes.

Q. And if you had been called out by the association in 2006 and they said we think there might be an issue with water intrusion and windows, and we think you need to do a forensic investigation, you would have recommended that they do a full investigation, correct?

A. I don't know that I would have. I would have potentially looked at the things that they wanted me to look at at the time. I don't see any evidence that that is something that would have been correlated into a full investigation like I was asked to do in this case at this time.

Clements also defined a hidden defect as one you cannot see and indicated he had found hidden defects in multiple areas around the complex.

Centex's forensic engineering expert, Carter, indicated that had the Board "taken action" or performed proper maintenance in 2006, it would have stopped some of the damage from occurring. He testified:

Q. Okay. What is the impact of not taking action of a leaking window in 2006 when you are looking at it now 17 years later?

A. I doubt very seriously that this would be an issue today if the recommendation from the property manager had been followed. There is no guarantee. As I mentioned earlier, in the real world, things happen, but it's not going to happen to the magnitude that it is happening here if it is properly maintained. It would be nice to have a non-maintenance required house, car. It doesn't happen. If you don't maintain your car or your house, you are going to have problems, and it is true for this building. It's up to the homeowners['] association to make the repairs to do the proper maintenance of their facility.

This testimony went to mitigation of damages as well as the issue of notice. At the JNOV hearing, the circuit court essentially stated it would not go behind the jury's verdict, but noted that the statute of limitations question had been a "hurdle" all along. The fact that a jury renders a decision does not abrogate the court's responsibility to grant a JNOV motion if appropriate. However, testimony from the experts in the case cut both ways as to notice, damages, and the cost of repair. The jury was properly charged on the statute of limitations, and we cannot say it was impossible for a reasonable jury to reach the verdict returned in this case. Therefore, we conclude the circuit court did not err in denying the JNOV motions.

## III. Statute of Repose

Centex also argues the circuit court erred in denying its directed verdict and JNOV motions based on the statute of repose because Wedgewood offered no evidence Centex had not taken at least slight care in constructing the condominiums, therefore precluding the gross negligence finding required to avoid the statute of repose. We disagree.

Section 15-3-640 of the South Carolina Code (2005) provided: "No actions to recover damages based upon or arising out of the defective or unsafe condition of an improvement to real property may be brought more than thirteen years after substantial completion of the improvement."[2] However, this limitation is

---

[2] The statute has since been modified and now provides for an eight-year time period. See S.C. Code Ann. § 15-3-640 (Supp. 2024) ("No actions to recover damages based upon or arising out of the defective or unsafe condition of an

not available as a defense to a person guilty of fraud,
gross negligence, or recklessness in providing
components in furnishing materials, in developing real
property, in performing or furnishing the design, plans,
specifications, surveying, planning, supervision, testing
or observation of construction, construction of, or land
surveying, in connection with such an improvement, or to
a person who conceals any such cause of action.

S.C. Code Ann. § 15-3-670(A) (Supp. 2024). "For the purposes of subsection (A),
the violation of a building code of a jurisdiction or political subdivision does not
constitute per se fraud, gross negligence, or recklessness, but this type of violation
may be admissible as evidence of fraud, negligence, gross negligence, or
recklessness." S.C. Code Ann. § 15-3-670(B) (Supp. 2024).

Centex's argument hinges on Wedgewood's emphasis on building code violations
at trial. Centex maintains code violations alone do not constitute gross negligence,
and it presented considerable evidence regarding Centex's inspection, review, and
quality protocols. However, the law clearly states code violations are admissible
*as evidence* of gross negligence. As Carter testified, code violations can vary in
degree and severity. Under these circumstances, it was for the jury to determine
whether gross negligence was established based on the evidence presented and the
law that was charged. The circuit court correctly charged "gross negligence" in the
manner agreed upon by the parties as follows:

Now, Wedgewood Condominium Association claims that
the Centex entities were grossly negligent in the
construction of the Wedgewood condominiums. Gross
negligence is the intentional, conscious failure to do
something, which is incumbent upon one to do, or the
doing of a thing intentionally that one [ought not] to do.
While negligence is the failure to exercise due care, gross
negligence is the failure to exercise even the slightest
care. Gross negligence is a relative term and means the
absence of care that is necessary under the circumstances.
Gross negligence denotes the failure to exercise a slight

---

improvement to real property may be brought more than eight years after
substantial completion of the improvement.").

degree of care. Gross negligence involves an intentional, conscious failure to do something which one ought to do, or the doing of something that one ought not to do. A defendant is guilty of gross negligence if they are so indifferent to the consequences of their conduct as to not give slight care to what they are doing.

Recklessness implies the doing of a negligent act knowingly. When a person acts negligently, and he realizes that he is acting negligently, the law says he is reckless, willful, and/or wanton. Whichever term you prefer, they mean the same thing; that is, the conscious failure to exercise due care. The words "recklessness," "willfullness," and "wantonness" are synonymous. The terms are used to describe a conscious failure to exercise and observe reasonable or due care.

Recklessness is distinguished from negligence. As I told you, negligence is the failure to use due care. Negligence is carelessness. Negligence is failure by omission or co[m]mission to exercise due care as a person of ordinary reason and prudence would exercise in the same circumstances.

Recklessness is a higher degree of culpability and responsibility. Recklessness signifies a conscious failure to exercise due care. Recklessness is a conscious indifference to the rights of the plaintiff or a reckless disregard of the rights of the plaintiff. Recklessness is an awareness of wrongful conduct in a continuation to act regardless of consequences.

Ladies and gentlemen, just so it is clear, while a negligent entity is one who acts carelessly, an entity whose behavior is reckless, willful, and/or wanton is not only careless in their actions, but also aware that they are careless.

The test for determining whether a tort may be deemed reckless, willful, or wanton is whether it was committed in such a manner and under such circumstances that a

person of ordinary reason or prudence would have been conscious of it as an invasion of the rights of the injured party.

The circuit court also correctly charged the law regarding code violations:

Now, I charge you that a violation of a building code violates a legal duty and is negligence per se and is evidence of recklessness and willfulness. Violation of a building code does not constitute recklessness, willfulness, and wantonness per se, but violation of a building code is some evidence that you may consider that a contractor acted recklessly, willfully, and wantonly.

Wedgewood presented evidence and testimony that Centex violated building codes and industry standards and that Centex was apprised of at least some of these deviations at the time of construction. In addition, the law on gross negligence was fully and correctly charged. Therefore, we affirm the circuit court's denial of Centex's motion for JNOV.

## IV. Unlicensed Subcontractors

Finally, Centex contends the circuit court erred in refusing to give its requested charge regarding unlicensed contractors.[3] We disagree.

"When reviewing a jury charge for alleged error, an appellate court must consider the charge as a whole in light of the evidence and issues presented at trial." *Welch v. Epstein*, 342 S.C. 279, 311, 536 S.E.2d 408, 425 (Ct. App. 2000). "An appellate court will not reverse the trial court's decision regarding jury instructions unless the trial court committed an abuse of discretion." *Cole v. Raut*, 378 S.C. 398, 404, 663 S.E.2d 30, 33 (2008). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or is not supported by the evidence." *Id.* "Where a request to charge is timely made and involves a controlling legal principle, a refusal by the trial judge to charge the request constitutes reversible error." *Fairchild v. S.C. Dep't of Transp.*, 398 S.C. 90, 104, 727 S.E.2d 407, 414 (2012)

---

[3] Centex's Issue on Appeal addresses the propriety of admitting evidence of its use of unlicensed subcontractors. However, the argument is solely focused on the circuit court's refusal to give the requested jury instruction. Therefore, our analysis is limited to that issue.

(quoting *Ross v. Paddy*, 340 S.C. 428, 437, 532 S.E.2d 612, 617 (Ct. App. 2000)). However, "[i]t is not error for the trial judge to refuse a specific request to charge when the substance of the request is included in the general instructions." *Burroughs v. Worsham*, 352 S.C. 382, 391-92, 574 S.E.2d 215, 220 (Ct. App. 2002). "To warrant reversal, the refusal to give a requested jury charge must be both erroneous and prejudicial." *Fairchild*, 398 S.C. at 104, 727 S.E.2d at 414.

Section 40-11-270(E) (Supp. 2024) of the South Carolina Code states:

> Licensees may utilize the services of unlicensed subcontractors to perform work within the limitations of the licensee's license group and license classification or subclassification; provided, the licensee provides supervision. The licensee is fully responsible for any violations of this chapter resulting from the actions of unlicensed subcontractors performing work for the licensee.

Centex requested this statute be charged, but the circuit court denied the request, explaining it commented too closely on the facts of the case and contained "too many dots in the middle." Wedgewood had requested the flipside of this charge, asking that the circuit court instruct "You may consider whether a contractor is unlicensed in making your decision." The circuit court had also denied this request as it commented too closely on the facts.

Centex's expert, Carter, had stated in his deposition that he would not use unlicensed subcontractors. His trial testimony acknowledged this statement.

> Q. Now, Mr. Carter, didn't you tell me in your deposition that you wouldn't hire unlicensed contractors?
>
> A. I personally would not.
>
> Q. Yes, sir. You did say that?
>
> A. I did, yes.
>
> Q. So you would never hire an unlicensed contractor to work on your job?

A. Well, our firm had a requirement that the subcontractor must be licensed and bonded. There are subcontractors that may be licensed, but they can't get bonds.

Q. All right.

A. But that's my company. *That doesn't mean it is a requirement on the rest of the industry.*

Q. You are aware, are you not, that the framing contractor and the brick mason on this job were not licensed?

A. I do not know that.

Q. Have you seen documents in evidence that show that?

A. I don't remember seeing that.

Q. Would you like to see them?

A. No, sir, I don't have to see them.

Q. Would you take my word that they are both unlicensed?

A. I have no reason to believe it or disbelieve it.

(emphasis added).

Construction manager Martin was also cross-examined regarding the use of unlicensed subcontractors on this job and generally as part of Centex's building process:

Q. Now, have you -- you submitted a subcontract orientation package, I believe; is that correct?

A. That's correct.

Q. Would you agree that Centex at times had unlicensed contractors on the job?

A. Not that I'm aware of.

Q. Did you require them to have licenses?

[CENTEX]: Objection, Your Honor. May we approach?

THE COURT: You may.

(Whereupon, a bench conference was had out of the hearing of the jury.)

Q. So we've heard from you that Centex was real interested in making sure they had the greatest subcontractors; is that right?

A. Not sure I testified to that, but yes we hired subcontractors to provide quality work for us.

Q. And some of the subcontractors at Wedgewood were unlicensed and did not have licenses, correct?

A. I don't know that specifically.

Q. I'll show you this exhibit from [the Department of Labor, Licensing[,]and Regulation (LLR)] and I'll have you look at the last page. AK Construction, if you would, tell me whether or not, based on that document, that AK Construction was licensed or unlicensed?

A. Yes. It states that someone found evidence they did not hold a license.

Q. And they were working at Wedgewood?

A. I don't know if they performed work at Wedgewood, personally.

Q. Let me show you BR Brick. Do you know BR Brick?

A. I do not.

Q. BR Brick did the brick work at Wedgewood. Did they have a license according to LLR?

A. It says they found no evidence of them holding a license.

Q. And in your subcontractor packet, one of the things you wanted to make sure about when you hired a subcontractor is that they had all the credentials, correct?

A. Yeah. We would check references and verify that they were credible subcontractors, yes.

Q. And these two did major work on siding and brick, and they did not have a license, right?

A. I think you stated that AK Construction was a framer, and BR Brick did brick work. It sounds like they did not have licenses, *but I don't believe that is required.*

Q. But that was a mistake by Centex by its own policy, correct?

A. I don't know that it was a policy or not.

Q. Let's look back at your new subcontractor orientation package. What exhibit do you have there, sir?

A. 87.

Q. So Page 3. The mission statement was something that you just talked about, right?

A. Correct.

Q. "To build quality homes and neighborhoods that

exceed the expectations that we have established with our customers"; is that right?

A. Yes.

Q. And you think that having unlicensed subcontractors would mean building quality homes?

A. I'm not certain you would have to hold a license to build a quality home.

Q. So you would let unlicensed subcontractors work on your home; is that right?

A. It depends what trade they perform. I don't think you have to -- I don't think that a license is required to provide cleaning services or anything.

Q. So you don't draw a correlation to the problems behind the brick and the framing and the siding with the fact that they are using unlicensed subcontractors; is that right?

A. I do not, no.

Q. You think that it is okay for a quality home to have unlicensed subcontractors, correct?

A. I think we did many things to verify that our subcontractors were qualified to perform work, and that included checking references and things of that nature.

Q. But checking licenses with the government, that is a basic thing to be done, right?

A. I don't know that it is a basic thing, but it can be done.

Q. And you did do it, because some of the others are licensed, correct?

A. Yes.  Absolutely, many are.

Q. But those two aren't.

(emphasis added).

The circuit court declined to charge on the issue of unlicensed subcontractors in a way that either suggested to the jury that having unlicensed subcontractors was wrong, as requested by Wedgewood, or permissible in the limited circumstances addressed by the statute.  Both Martin and Carter indicated their understanding that using only licensed subcontractors was not a requirement.  While it fell within the circuit court's discretion to charge the statute under these circumstances, we find declining to charge it as requested did not constitute reversible error.

## V.      Additional Sustaining Ground—Master Deed

As an additional sustaining ground, Wedgewood argues the one-year warranty given by Centex is still in effect because Centex never turned over its rights to Wedgewood *in writing* pursuant to the terms of the Master Deed.  However, the plain language of the deed states the warranty expired after one year.  It provided:

> 3.6 Limited Warranty From Developer. FOR A PERIOD OF ONE (1) YEAR FROM THE DATE OF COMPLETION OF CONSTRUCTION . . . THE DEVELOPER SHALL AT NO COST TO THE ASSOCIATION REPAIR OR REPLACE (IN THE DEVELOPER'S DISCRETION) ANY PORTIONS OF THE COMMON AREA . . . WHICH ARE DEFECTIVE AS TO MATERIALS OR WORKMANSHIP. . . .  Each Owner, in accepting a deed from the Developer or any other party to a Unit, expressly acknowledges and agrees that this Section 3.6 establishes the sole liability of the Developer to the Association and the Owners related to defects in the Common Area and the remedies available with regard thereto. At the end of the one (1) year warranty period referred to hereinabove in this Section 3.6, the Developer will assign to the Association in writing all of its rights, claims, causes of action and demands which it has or which may thereafter accrue

against all other people who may be responsible for the
design and/or construction of the Common Area.

Wedgewood argues the assignment in writing was a trigger or condition precedent to end the warranty obligation on the common area. However, that argument is simply without merit as the plain language in the master deed indicates the warranty terminated at the conclusion of one year.

## CONCLUSION

To summarize, we affirm the circuit court's denial of Centex's JNOV motions with respect to the statute of limitations and statute of repose and find no reversible error in the circuit court's handling of the evidence and instructions relating to unlicensed contractors. Therefore, the orders of the circuit court are

**AFFIRMED.**

**MCDONALD and VINSON, JJ., concur.**